## METZ, ET AL., v. BLACKBURN, ET AL.

FRAUDULENT CONVEYANCE — ANTENUPTIAL CONVEYANCE — CONSIDERATION — DURESS — HUSBAND AND WIFE — ATTORNEY AND CLIENT.

1.   Where it was sought by a husband to set aside a conveyance of lands executed by him to his wife a short time before marriage, the consideration being the marriage about to be solemnized, a finding that a written marriage contract providing for the conveyance purporting to have been executed some months before the conveyance and marriage, was in fact prepared and signed several months after the marriage for a fraudulent purpose, based upon the unsupported testimony of the husband, is not sustained by the evidence, but is erroneous; it appearing that the instrument is in the handwriting of the husband, and is produced at the trial, and was acted upon by the parties, by the delivery of the deed and the marriage of the parties, and that the husband told the notary who drafted the deed, that the deed was to be made in fulfillment of the marriage contract which he had previously entered into with the grantee in writing, and that he wrote several letters to his former attorney, now a respondent in the suit, in which he relied upon the making of the contract at the time it purported to have been made, and stated in the letters that it was so signed.

31

2. Upon the evidence in the case, it is held that the consideration for a conveyance sought to be set aside by the husband grantor and the latter's creditors, was the agreement of the grantee to marry the grantor, subsequently consummated.

3. Marriage is not only a valuable consideration, but a valuable consideration of the highest character.

4. T., a man 50 years old, entered into a written contract with P., a woman 56 years old, whom he subsequently married, to convey certain lands to her in consideration of her agreement to marry him. He afterward, and a few days before the marriage, executed the deed, and before the ceremony delivered it to the grantee. In a suit by his creditors to set aside the deed as fraudulently made, he filed a cross petition for the same purpose, on the alleged ground that the grantee had made several promises which she had not fulfilled, and that she had married him fraudulently to obtain his property. The trial court found that the grantee permitted the marriage ceremony to be performed, not in good faith, but as a means of defrauding the grantor of his property. *Held*, that the finding is not sustained by the evidence, it appearing that after the ceremony the parties lived together as husband and wife in the town where they were married, for a time, afterward on the ranch conveyed to the wife by the deed aforesaid, and later in Chicago, continuing to so live together from the marriage in September until the end of the following March, and apparently upon agreeable terms, and after that time there was a frequent interchange of letters between them, the husband having gone to Colorado, and a letter from the wife to him is affectionate in tone; and she testified that they were in love with each other, and he testified that he was infatuated with her at the time of the marriage.

5. A conveyance in consideration of a promise of marriage subsequently solemnized, stands upon somewhat different grounds from other conveyances, since, if set aside, there can follow no dissolution of the marriage, and the parties cannot be placed in their former positions.

6. Mere presence of fraud in a marriage contract is not sufficient to dissolve it. The fraud must exist in the common law essentials of it, and false representations in regard to family, fortune, or external conditions are not sufficient.

7. Where promise of marriage, afterward performed and consummated, forms the principal and primary consideration for the antenuptial conveyance of property from the hus-

band to the wife, the latter's failure to perform certain incidental promises, such as to pay his debts or to care for his child by a former wife, and the like, will not be sufficient to avoid the conveyance at the suit of the husband.

8. Although by an antenuptial conveyance of property by a husband to his wife, in fulfillment of the marriage contract, the husband becomes insolvent, it does not necessarily follow that the conveyance must be deemed fraudulent as to the husband's creditors.

9. Where a conveyance is made in consideration of marriage, to be held fraudulent as to creditors, the husband being made insolvent by the transfer, it must appear that it was executed by the grantor with intent to hinder, delay, or defraud his creditors, and that the grantee participated in the fraud.

10. Even if the grantee (the wife) had a fraudulent design in marrying the grantor, and promised to and did marry him for the sole purpose of obtaining his property, and made to him untrue representations to induce him to marry her, and convey to her his property in consideration of the marriage, the creditors of the grantor would have no standing as against her if no fraud had been practiced by the grantor.

11. Although the unsupported assertion of a grantor that he was unduly influenced to make a conveyance of lands might be accepted as sufficient proof of the fact of such undue influence (which is doubtful), yet, as between himself and one purchasing from his grantee upon the faith of his representations, the equities are all with the purchaser who has expended his money upon the faith of such grantor's representations and assertions.

12. T. conveyed lands to his wife prior to the marriage, and in consideration thereof. Afterward certain of his creditors brought suit to set aside the conveyance as fraudulent. In that suit M. was employed by T. to defend the conveyance, and the latter frequently represented to M. that the conveyance was all right, and made in consideration of the marriage and in good faith. The land was sold by the wife to her son by a deed in which the husband joined, and thereafter the land was sold to and purchased by M., the attorney employed by T. to defeat the claims of the creditors. M. had relied upon the statements of T. that the deed to his wife was in good faith; and the sale by the wife was made with the husband's knowledge. Subsequently T. filed a cross petition, alleging that the conveyance was obtained from him by his wife by

the making of false promises and representations, and sought
to avoid the conveyance on that ground. It was claimed that
M., the attorney, was chargeable with notice of T.'s equities.
*Held*, that having been employed to sustain the very convey-
ance by T., who now claimed it to have been fraudulently
obtained from him; and T. having continually, up to the time
of the purchase by M., asserted to him that the conveyance
was fair and valid and the transaction wholly to his satisfac-
tion, M. cannot be deemed to have had notice of any equi-
ties of T.

13. Although absolute good faith is justly required of an attor-
ney in all his dealings with his client, the rule does not go to the
extent of requiring the attorney, at his peril, to divine that at
some future period the client will desire to repudiate the very
transaction he is employed to defend.

[Decided June 28, 1901.]

ERROR to the District Court, Sheridan County, HON.
RICHARD H. SCOTT, Judge of First District, presiding.

This was a suit to set aside a conveyance executed by
one James Terrill to Mary B. Personette, who soon there-
after became Mrs. Terrill. The suit was instituted by
certain creditors of Terrill. Subsequently, and after Ter-
rill had answered in the case in opposition to the credit-
or's claims, Terrill filed a cross-petition seeking to avoid
the same conveyance on the ground that fraud was prac-
ticed upon him by the grantee. Pending the suit, and
after Terrill had filed his original answer, the lands in-
volved were purchased by E. E. Lonabaugh, for a valu-
able money consideration from Wilson B. Personette, the
son of Mrs. Terrill, to whom the land had been conveyed
by Mrs. Terrill and husband, James, the latter being the
original grantor. The consideration for the first convey-
ance to Mrs. Terrill, was her promise to marry him. Ter-
rill claimed in his cross-petition that he was induced to make
the conveyance to her by certain promises and representa-
tions made to him by her before the conveyance and mar-
riage, and that the representations were false, and that
she had failed to perform the promises. Metz obtained
an interest in the premises from Lonabaugh. Metz was

the attorney originally employed by Terrill to oppose the claims of the creditors, and he filed the answer for Terrill. Metz and Lonabaugh became parties to the suit on their own application.   The district court held the conveyance to be void as to Terrill, and also as to his creditors.

Metz and Lonabaugh prosecuted error.   The material facts, as well as the various points involved and the claims of the various parties, are more fully set out in the opinion.

*Clark & Breckons*, for plaintiffs in error.

It does not appear from the findings of fact that the conveyance from Terrill to Mary Personette was made with the *intent on his part to hinder, delay, or defraud his creditors*.   On the contrary, the facts found, by fair implication, negative the existence of any such intent. The court does find as a fact that by means of false and fraudulent representations, Mary Personette, afterward Mary Terrill, induced James Terrill to convey his property to her.   These facts might, perhaps, if the title were in Mary Terrill and the suit was against her only, justify a court in decreeing a reconveyance, because of the fraud practiced by her *upon him*.   But these plaintiffs are not here seeking relief because of a fraud practiced upon their debtor, but solely upon the ground that their debtor had practiced a fraud upon them; viz., that he conveyed away his property with intent to hinder, delay, and defraud them out of the collection and enforcement of their just demands; and they can recover only upon the grounds alleged by them in their petition.   It is an elementary rule of law that in all cases the allegations and proofs must agree.   *A party can no more succeed upon a case proved but not alleged than upon a case alleged but not proved.*   (Bump on Fraud. Conv., Sec. 576; Wait on Fraud. Conv., Sec. 182; Bachman v. Sepulveda, 39 Cal., 689; Bailey v. Ryder, 10 N. Y., 363; Tripp v. Vincent, 3 Barb. Ch., 613; Bank v. Root, 3 Paige Ch., 478; Vance v. Evans, 11 W. Va., 370; Foster v. God-

dard, 66 U. S., 506; Harrison v. Nixon, 9 Pet., 483; Boone v. Chiles, 10 Pet., 177.) .

But even if the plaintiffs had alleged and proved the fraud practiced upon James Terrill as the basis for the relief sought by them, it would have availed them nothing, because it is well settled as a proposition of law, that the fraud which will sustain the claim of a creditor to cancel and set aside a conveyance made by a debtor of his property must be the fraud of *the debtor* practiced and attempted *by him*, and *not* a fraud practiced and perpetrated *upon him*. (Bump on Fraud. Conv., Sec. 20; 14 Enc. L. (2d ed.), 266; 10 *id.*, 333; Wait on Fraud. Conv., Sec. 403; Parker v. Roberts, 116 Mo., 657; Garretson v. Kane, 27 N. J. L., 208; McAlpine v. Sweetser, 76 Ind., 78; Hovey v. Holcomb, 11 Ill., 660; Graham v. R. Co., 102 U. S., 148; Griffin v. Stoddard, 12 Ala., 783; Crocker v. Bellangee, 6 Wis., 645; Petters v. Smith, 4 Rich. Eq., 197; Easton v. Perry, 29 Mo., 96; Lewis v. Rice, 61 Mich., 97; Colbern v. Robinson, 80 Mo., 541; Dougherty's Estate, 9 W. & S., 189; Lewis v. Rogers, 16 Pa. St., 18.)

It does not appear from the facts found by the court below that the conveyance from James and Mary Terrill to Wilson B. Personette was executed without consideration, or that it was executed in pursuance of any conspiracy between grantors and grantee, or that it was executed with the design or purpose of hindering or delaying or defrauding the creditors of James Terrill, or that it was from any cause or for any reason whatsoever, in the slightest degree, tainted with fraud.

Plaintiff's case, therefore, was not established. (8 Ency. of Pl. & Pr., 945; 2 Thomp. on Tr., Sec. 2694; Marks v. Sayward, 50 Cal., 58; Newby v. Meyers, 24 Pac., 971; Ry. Co. v. Owens, 50 Pa^., 962; Metcalf v. Hart, 3 Wyo., 513; Ry. Co. v. Griffith, 38 Pac., 478; Monehout v. Barron, 42 Cal., 591; Perkins v. S. Nev. S. M. Co., 10 Nev., 405; Arnold v. Angell, 62 N. Y., 508; 12 Ency. of Pl. & Pr., 131; 11 Ency. of Pl. & Pr., 868, *et seq.*; Spoors v. Coen, 44 O. St., 497.) .

If it be true, as alleged by the plaintiffs, that the conveyance to Wilson B. Personette was made by James Terrill and Mary Terrill for the purpose of hindering and delaying and defrauding James Terrill's creditors, in which unlawful purpose the grantee participated, then and in such case, there is no proposition of law more firmly established than that as between the grantors and grantee to that conveyance, it was absolutely good and valid, and the title conveyed to Personette absolutely unimpeachable, excepting only by the creditors of the grantor.

This being true, how can it be a fact, as found by the court, that Wilson B. Personette held the title to this property simply as a trustee for the use and benefit of his mother? If, on the other hand, it be true as found by the court, then how can it possibly be true as alleged by the plaintiffs that the conveyance was made for the purpose of defrauding the creditors of the grantors, in which purpose, both grantors and grantee participated? (Pittman v. Pittman, 107 N. C., 159; 1 Story Eq. Jur., Sec., 371; Waite Fraud. Conv., Sec. 171.)

There being, in the findings of fact, no fact in issue found which tends to affect the validity of the title acquired by Wilson B. Personette, through the deed to him from James Terrill and Mary Terrill, it follows as a matter of law that he could convey an unimpeachable title to Lonabaugh, his grantee, and that the title which Lonabaugh acquired by his deed was wholly unaffected by the fact found by the court, that at the time of the conveyance Lonabaugh and Metz had knowledge that Mary Terrill, one of the grantors in the deed to Wilson B. Personette, had obtained the deed of September 10, 1896, from James Terrill through fraud. (1 Story on Eq. Jur., Secs. 409, 410; 2 Pomeroy Eq. Jur., Sec. 754; Allison v. Hagan, 12 Nev., 39; Studebaker v. Langard, 79 Ind., 320; Fulton v. Woodman, 54 Miss., 159; Evans v. Nealis, 69 Ind., 148.)

The rule is imperative that nothing will or can be supplied by intendment; that if the findings fail to show the existen.e of a material and essential fact to the case of the

party sustaining the burden of proof, a judgment in favor of such party cannot be upheld. (8 Ency. of Pl. & Pr., pages 933–943; 2 Thomp. on Tr., Secs. 2651, 2652, 2658; Elliott on App. Proc., Secs. 753, 754; Kehr v. Hall, 117 Ind., 405; Mitchell v. Brawley, 140 Ind., 216; Hays v. Hostetter, 125 Ind., 60; Freedom v. Norris, 128 Ind., 377.)

The findings of the court were not only not within the issues, but they are not sustained by the evidence, either as to the issues raised by plaintiffs, or Terrill as cross-petitioner. In a case like this, especially, the facts should be established beyond any reasonable controversy. (Lalone v. U. S., 164 U. S., 255; U. S. v. Am. Bell Tel. Co., 167 U. S., 224; U. S. v. Mng. Co., 128 U. S., 673; Kennedy v. Bldg. & Loan Asso., 57 S. W. Rep., 388; Howland v. Blake, 97 U. S., 624; Lavassar v. Washburne, 50 Wis., 200; Mc Clellan v. Sandford, 26 Wis., 595; Kent v. Lasley, 24 Wis., 654; Harter v. Cristoph, 32 Wis., 245–248; Ins. Co. v. Nelson, 103 U. S., 544; Smith v. Allis, 52 Wis., 337; Ford v. Osborne, 45 O. St., 1.)

There is no pretense that any one had personal knowledge of the transactions between Terrill and his wife, further than that he had conveyed his property to her, and married her. There is nothing in the testimony to charge Metz and Lonabaugh with notice of any equities of Terrill, even if he had any. A purchaser is not affected by vague rumors, hearsay statements, and the like, concerning prior and conflicting claims upon the property. (2 Pom. Eq., Secs. 597, 602; Raymond v. Flavel, 40 Pac., 158.) Had these purchasers known that the conveyance was void as against Terrill's creditors, if it were so in fact, still that knowledge would not charge them with notice of Terrill's equities as against his grantee. (Bump on Fraud. Conv., Sec. 492.) The fact that Metz had been employed by Terrill to defend the attachment suits, in no way changes the rule.

There is nothing in the claim of undue influence. The consideration for the conveyance was the grantee's

promise to marry the grantor. The latter knew what he was doing, and what he was receiving in return. He acted with his eyes open. It may be that the marriage was brought about by selfish and mercenary inducements, and that there was an absence of pure and holy sentiments. It may be that there was an impure desire on the one side, and mercenary motives on the other; but what of it? That will not authorize a court of equity to annul the marriage, or to cancel a conveyance made in consideration of such a marriage. It frequently happens that a marriage settlement is the main inducement to a marriage. None of the facts shown in the evidence render the marriage between Terrill and Mrs. Personette either void or voidable, or to render the deed made in consideration thereof void. (Van Houten v. Morse, 162 Mass., 414; 1 Beach on Trusts, Sec. 233; Piper v. Hoard, 107 N. Y., 67). The representations and promises outside of the grantee's promise to marry the grantor are not sufficient to authorize a court to declare the marriage void or to declare the deed void. (Prewit v. Wilson, 103 U. S., 22; 2 Kent's Com., 77; Schouler Dom. Rel., 40; 1 Bish. Mar. & Div., Sec. 167; Reynolds v. Reynolds, 3 Allen, 605; Varney v. Varney, 52 Wis., 120; Wier v. Still, 31 Ia., 107; Barnes v. Barnes (Cal.), 42 Pac., 904.)

That the contention that the marriage was only such in name, and that the wife did not intend to live with the husband, or perform toward him the duty of a wife, and that the marriage was simply part of her scheme to get his property, should have any force whatever, it is essential that the proof should establish clearly and satisfactorily that the alleged intention existed at the time of the conveyance and marriage. It is well settled that whatever may be the conduct of the parties, or one of them, after the marriage, it will not cause the guilty party to forfeit rights acquired in the original transaction. (Bowie v. Bowie, 1 Md., 87; Michael v. Morey, 26 id., 239; 14 Ency. L., 548, 549.) There is no force in the proposition that if the marriage contract was signed after the

marriage that the statute of frauds will operate to render the deed void. The contract was an executed one upon the execution of the conveyance, and the statute is directed only against executory contracts. (Brown on Stat. Fr., Sec. 116; Tolman v. Ward, 41 Am. St., 557; Gibson v. Bennett, 79 Me., 302; Marshall v. Rugg, 6 Wyo., 270; Wait on Fr. Conv., 212; Sterry v. Arden, 1 Johns. Ch., 260; 14 Enc. L., 543; Verplanck v. Sterry, 12 Johns., 536; Smith v. Allen, 5 Allen, 454; Prignon v. Daussat, 31 Am. St., 914.) A voluntary deed is made good by a subsequent marriage. (Hening v. Wickham, 29 Gratt., 628; Klauber v. Vigueron, 32 Pac., 248; Snyder v. Grandstaff, 31 S. E., 647.)

A conveyance in consideration of marriage made by one who is at the time insolvent, or who is thereby rendered insolvent, and made with the actual design and intent on the part of the grantor to hinder, delay, and defraud his creditors, will not be annulled at the suit of the creditors, without the clearest proof of the wife's participation in the intended fraud.

In such case, the grantee, in the eyes of the law, stands with reference to the property in precisely the same position she would occupy had she bought the property and paid full and adequate pecuniary consideration for it.

The fact that by the conveyance the grantor transferred all or nearly all of his estate, does not on that account make it void as to the creditors. (Magniac v. Thompson, 7 Pet., 348; Prewit v. Wilson, 103 U. S., 22; Wells v. Cole, 6 Gratt., 645; Hagerman v. Buchanan, 14 Am. St., 732; Wait Fr. Conv., 212–302; Bump Fr. Conv., 271–274; 2 Devlin Deeds, 208; Boggess v. Richards, 39 W. Va., 567; Connor v. Stanley, 65 Cal., 183; Cohen v. Knox, 13 L. R. A., 711.) The recital of a money consideration in the deed does not render inadmissible parol testimony to establish the real consideration. (Tolman v. Ward, 86 Me., 303; Goodspeed v. Fuller, 46 Me., 141; Coles v. Soulsby, 21 Cal., 48; Bennett v. Soloman, 6

*id.*, 135;  Mc Crea v.  Purmort,  30 Am.  Dec.,  103;
Nichols v. Burch, 128 Ind., 324; Hanan v. Oxley, 23
Wis., 579; 2 Devlin Deeds, Secs. 829, 830; 2 Jones Ev.,
474; 6 Enc. L., 767–773.)

Lonabaugh purchased the property at a time when the
attachments of the plaintiffs below were resting upon it,
and at the time of the purchase he and Metz had actual
notice of the pendency of the attachment suits.   Under
such circumstances, they took the property subject to any
right which the plaintiffs in those suits might eventually
establish in and to the property.   We do not admit, how-
ever, that the judgment in the attachment suits fixed or
established any right in and to the property in the plain-
tiffs below.   At the time of the service of the writs, the
title to the property was in Wilson B. Personette, and as
he was not a party to the attachment suits, his title was
wholly unaffected by any proceedings therein.   The title
to the land was not and could not be adjudicated in those
suits.   (1 Shinn on Att., Sec. 318; 3 Ency. L., 2d ed.,
223; Drake on Att., Sec. 234; Plant v. Smythe, 45 Cal.,
161; R. S., 1899, Secs. 3988 and 3991.)

The title which Lonabaugh and Metz acquired through
the deed from Wilson B. Personette is valid in every
respect, and should be upheld against the claim of James
Terrill.   At the time of the purchase of said land, they
had neither knowledge nor notice of the existence or any
right or interest on the part of James Terrill in and to the
land, or of any fact, which would put them on inquiry
with respect to any such right or interest on his part.
Even if it should be said that the street talk and gos-
sip, which took place in Sheridan, concerning the transfer
from Terrill to Mary Personette, were sufficient to make
it incumbent on intending purchasers to investigate that
matter before purchasing, and such is not the law, what
more could have been done than to have gone to James
Terrill, and inquired of him as to the facts?   He was the
one man who knew the facts, and how could this require-

ment have been more fully met than was the case here? and from him comes the repeated assurance that the transfer was fair and open and upright, and that the street talk was unfounded and malicious. (Fletcher v. Peck, 6 Cranch, 87; Bean v. Smith, 2 F. C., 1174; White v. Graves, 107 Mass., 325; Deputy v. Stapleford, 19 Cal., 302; Somes v. Brewer, 2 Pick, 183; Beals v. Neddo, 2 Fed., 41; In re Binford, 3 F. C., 1411; Boone v. Chiles, 10 Pet., 177; Swase v. Burke, 12 id., 11; 2 Pom. Eq., 767; 1 Story, Eq. J., 434; 2 id., 1502; Bump. Fr. Conv., 493–5; Bish. Contr., 672–3; note 32, L. R. A., 32; note 3, id., 822.)

The conduct of Terrill estops him from claiming any interest in the land as against the purchasers. (Kirk v. Hamilton, 102 U. S., 68; Wendell v. Van Rensselaer; 1 Johns. Ch., 344; Barnard v. Campbell, 55 N. Y., 457; McGovern v. Knox, 21 O. St., 547.) The owner furnishing another with the *prima facie* power to dispose of it, he will be bound by the latter's sale of it to a *bona fide* purchaser for value, and if he stands by and permits it to be sold without giving notice or asserting his rights, he will be estopped from setting up his claim against the purchaser, and certainly so if he assists in the sale. (46 N. Y., 329; 20 Wend., 267; 86 U. S., 13; 24 Ark., 399; 10 Ark., 211; 52 Ga., 198; 35 N. H., 99; 16 Ala., 714; 30 N. Y., 517; 7 L. R. A., 755; Johns. Ch., 167; 136 Pa. St., 588; 20 Am. St., 939; 86 U. S., 13; 1 Johns. Ch., 344.)

*Appelget & Mullen* and *N. K. Griggs*, for defendants in error.

The title derived from Terrill by Mrs. Personette was as to him fraudulent. It is a well-settled rule that persons who are about to enter into the marriage relation do not stand in the relation of buyer and seller, but rather in a position of trust and confidence, and their dealings with each other must be fair. (Stewart on Marriage and Divorce, 28; Pierce v. Pierce, 71 N. Y., 154; *Re* Bierer,

92 Pa. St., 265; Daubenpeck v. Briggs, 71 Ind., 255; Russell's Appeal, 75 Pa. St., 289; Pond v. Skein, 2 Lea, 126; Meldrum v. Meldrum, 11 L. R. A., 65; Dougthel v. Appelget, 6 Pac. R., 575.) An act of one of the contracting parties intended to mislead and deceive the other, and which controls the act of the other to his detriment, is actionable, and a court of equity will set aside as fraudulent any advantage obtained by reason of such acts. (Story's Eq. Juris., 308; Taylor v. Taylor, 8 Howard, 198; Sprague v. Hall, 17 N. W., 745; Dickenson v. Dickenson, 24 Neb., 530; Cook v. La Motte, 15 Beav., 234.)

Again, there is a clear distinction between transactions between persons bearing a fiduciary relation to each other and those between persons bearing no such relation. In the first case the law presumes fraud, and the burden is upon the party denying the fraud to show its absence. In the other case, he who alleges fraud must prove it. The presumption of fraud in dealings between persons standing in fiduciary relations arise, not because the court can see that there is, but because there may be fraud. (Atkins v. Withers, 94 N. C., 581; Huguinin v. Baseley, 2 Lead. cases, Eq. Pt. 2, 1156; Kerr, Fr. and Mistake, 385-6, 151; Letson v. Reed, 7 N. W., 231; Pierce v. Pierce, 71 N. Y., 154.) And conduct which would amount to fraud in another transaction, where the parties maintained a confidential relation, will amount to fraud in a marriage settlement. (Meldrum v. Meldrum, 11 L. R. A., 65.) The influence of a man over a woman, or a woman over a man, to whom he is engaged to be married, is presumed to be so great that in transactions between them the court will look with great vigilance at the circumstances and situation of the parties, and will not only consider the influence which the intended husband, either by soothing or violence, may have used, but require satisfactory evidence that it has not been used. (7 Oregon, 374.) Undue influence exercised by the grantee over the grantor to obtain a conveyance of real

estate, resulting in a benefit to the former and a great disadvantage to the latter, will avoid the deed.

The proof showing that the grantee exercised undue influence over the grantor in obtaining a deed to the great benefit of the former and great disadvantage of the latter, by reason of the close and tender relations between the parties, visits having been interchanged, and loving letters passed between them, and the woman threatening to annul the promise of marriage unless the trade was complete, is sufficient ground for setting aside the conveyance. She worked upon his passions, excited his fears, and alarmed him by the dread of separation. In the negotiations, the conditions were unequal. A woman can always exert an undue influence over the man she professes to love. (Rockafellow v. Newcomb, 57 Ill., 187; Shaw v. Shaw, 9 N. Y., 897; Bigelow on Fraud, 261; Kerr on Fraud, 151; Hov. Fraud, 18; Hatch v. Hatch, 9 Ves., 296; Brisson v. Brison, 17 Pac., 691.)

To obtain the cancellation of the deed from Terrill to his wife, it is not necessary on Terrill's part to show such fraud as would authorize the annulment of the marriage. In this case we have a confidential relation existing between the parties at the time of the conveyance, and admitting that marriage entered into with *bona fide* intent is a sufficient consideration, and that marriage is a civil contract, there is no reason why the ordinary rules of equity do not apply in the setting aside of conveyances procured by a marriage with fraudulent intent. By virtue of the conveyance, Mrs. Terrill became a mere trustee for James Terrill. Wherever by misrepresentation or other practice at variance with honest, fair dealing, one is deceived, entrapped, or surprised into a conveyance of the legal title to his property, courts of equity will not only not allow the fraudulent grantee to avail himself of the transaction, but will construe him to be a trustee, and will order him to account, upon equitable principles, and make a reconveyance. (Tyler v. Black, 13 Howard, 231; Boyce v. Grundy, 3 Pet., 210; Smith v. Richards, 13

Pet., 26; McAllister v. Barry, 2 Hayw. (Tenn.), 290; Walker v. Dunlap, 5 Hayw., 271; Stephenson v. Taylor, 1 A. K. Marsh, 235; Pitts v. Cottingham, 9 Port., 675; Harris v. Williamson, 4 Hayw., 124; Lewis v. McLemore, 10 Yerg., 206; Spence v. Duren, 3 Ala., 251; Harris v. Carter, 3 Stew., 233; Howard v. Weldon, 2 Ves. Sr., 517; Neville v. Wilkinson, 1 Bro. Ch., 543; Earl of Bath's Case, 3 Ch. Cas., 56; Willan v. Willan, 16 Ves. Jr., 82; Say v. Barwick, 1 Ves. & B., 195; Barnesly v. Powel, 1 Ves. S., 289; Matthew v. Hanbury, 2 Vern., 187; Bridgemen v. Green, 2 Ves. Sr., 627; Evans v. Lewellin, 1 Cox. Ch., 340; Bennett v. Vade, 2 Atk., 324.)

If one party obtains the legal title to property, not only by fraud, or by violation of confidence of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner. (1 Perry Trusts, Sec. 166; Spence Eq. Jur., 511; McLane v. Johnson, 43 Vt., 48; Collins v. Collins, 6 Lans., 368; Thompson v. Thompson, 16 Wis., 94; Pillow v. Brown, 26 Ark., 240; Ryan v. Dox., 34 N. Y., 307; Dodd v. Wakeman, 26 N. J. Eq., 484; Green v. Ball, 4 Bush, 586; Hunt v. Roberts, 40 Me., 187; Hodges v. Howard, 5 R. I., 149; Laing v. McKee, 13 Mich., 124; Nelson v. Worrall, 20 Ia., 469; Coyle v. Davis, 20 Wis., 564; Hidden v. Jordan, 21 Cal., 92; Sandfoss v. Jones, 35 Cal., 481; 1 Pom. Eq. Jur., 137.)

Wilson B. Personette was a mere volunteer in the conveyance to him. Whether he had actual knowledge of the original fraud is immaterial, because of the one fact that he was not a purchaser for a valuable consideration; he held the naked legal title in trust for his mother.

Property converted by the trustee continues subject to the trust. (Fox v. McKreth, 1 Lead. Cas. Eq., 115; Taylor v. Plummer, 3 Maul, 562; Wells v. Robinson, 13

Cal., 133; Lathrop v. Bampton, 31 Cal., 17; Schafer v. Corson, 52 Barb, 510; Swinbourne v. Swinbourne, 28 N. Y., 568; Hastings v. Drew, 76 N. Y., 9, 16; Bartelee v. Drew, 57 N. Y., 587; Holden v. N. Y. & E. Bank, 72 N. Y., 286; Newton v. Porter, 69 N. Y., 133, 136–140; Taylor v. Mosely, 57 Miss., 544; Burks v. Burks, 7 Baxt., 353; Broyles v. Nowlin, 3 Baxt., 191; Tildord v. Torrey, 53 Ala., 120; Pindall v. Trevor, 30 Ark., 249; Friedlander v. Johnson 2 Woods, 675; McDonough v. O'Neil, 113 Mass., 92; Tracy v. Kelley, 52 Ind., 535; Cookson v. Richardson, 69 Ill., 137; Coles v. Allen, 64 Ala., 98; Dodge v. Cole, 97 Ill., 338; Derry v. Derry, 74 Ill., 560; Newton v. Taylor, 32 O. St., 399; Barrett v. Bamber, 81 Pa., 247; Velle v. Blodgett, 49 Vt., 270; Hubbard v. Burrell, 41 Wis., 365; Bk. v. Ins. Co., 104 U. S., 54; Oliver v. Piatt, 44 U. S., 3 How, 333; May v. LeClare, 78 U. S., 11 Wall., 217; Duncan v. Jauden, 82 U. S., 15 Wall., 165; Bayne v. U. S., 93 U. S., 642; U. S. v. State Nat., Boston, 96 *id.*, 30.)

A party obtaining trust property, with notice of the trust, holds it as trustee for the beneficiary. (Bank v. Levy, 3 Paige, 606; Adair v. Shaw, 1 Sch. & Lef., 243; Boursot v. Savage, 2 Eq., 134; Heath v. Crelock, 18 Eq., 215; *Re* European Bank, 5 Ch., 358, 362; *Re* Hallett's Estate, 13 Ch. Div., 696; Mansell v. Mansell 2 P. Wms., 678; Lench v. Lench, 10 Ves. Jr., 511; Lewis v. Maddocks, 17 Ves. Jr., 48, 56; Griffin v. Blanchair, 17 Cal., 70; Sharp v. Goodin 51 Cal., 219; Scott v. Umbarger, 41 Cal., 410; Pice v. Reeves, 38 Cal., 457; Siemon v. Schurck, 29 N. Y., 598; Swinbourne v. Swinbourne, 28 N. Y., 568; Pom. Eq. Jur., 621.)

Metz and Lonabaugh are not *bona fide* purchasers, without notice, and as such, even were it conceded that they purchased for value, they cannot invoke this rule, but are subject to the rule that being chargeable with notice, they take the legal title impressed with the trust in favor of Terrill.

More than this, Metz was at the time of dealing in conjunction with Lonabaugh for the purchase of this land, the attorney of James Terrill in two actions involving the subject-matter of his purchase.   The negotiations were kept secret from Terrill.   The purchase was made without the latter's knowledge.   By this dealing with the property of his client, he became his trustee in relation to the title he obtained.

Public policy demands that there should be no temptation of any one occupying the important relation of attorney, to make private gains out of the subject-matter of his professional employment.   The purchase of an interest in the thing in controversy by an attorney is forbidden in opposition to the title of his client.   Such purchase is void.   (Rogers v. Priest, 43 N. W., 510; Davis v. Kline, 2 L. R. A., 79; Baker v. Humphrey, 101 U. S., 494.)

The burden of proof did not rest upon Terrill to show the *mala fides* in the deed to Mrs. Terrill's son, or to fix knowledge of the original fraud upon Metz and Lonabaugh. The fraud in the original transaction being shown, one claiming as a subsequent purchaser must show consideration paid without notice of the fraud.   (Tillman v. Heller, 11 L. R. A., 628; Wait on Fraud. Conv., 369–385; Litson v. Read, 7 N. W., 231; Savage v. Hazzard, 11 Neb., 327; Lane v. Starkey, 15 *id.*, 289; Ferguson v. Gilbert, 16 O. St., 89; Whitney v. Rose, 43 Mich., 27; Kilpatrick, etc., Co. v. Kohn, 36 Pac., 327.)   In no view of the case can they claim as *bona fide* purchasers.

Terrill was not estopped.   Lonabaugh was acting for Metz, and the knowledge of the principal will be imputed to the agent.   Lonabaugh had no right to rely upon any of the representations, as they were not made to him.   The representations were not made for the purpose of inducing action on the part of Metz and Lonabaugh.   The doctrine of estoppel is not to be applied in aid of a fraudulent purpose.   .(Woods v. Wilson, 37 Pa. St., 379; Martin v. Zellerback, 38 Cal., 300; Hambleton v. R. R. Co., 44 Md., 551; Biddle v. M. Co., 14 Cal., 279; Kuhl v.

Mayor, 23 N. J. Eq., 84; Piper v. Gilmore, 49 Me., 149; Turner v. Coffin, 12 Allen, 401; Wilcox v. Howell, 44 N. Y., 398; Bank v. Bank, 50 *id.*, 575; Maloney v. Horan, 49 *id.*, 111; Copeland v. Copeland, 28 Me., 525; Shaw v. Beebe, 35 Vt., 205; Doller v. Brubaker, 52 Pa. St., 498; Davidson v. Young, 38 Ill., 145; Morgan v. Spangler, 14 U. S., 118; McLaren v. Jones, 33 S. W., 849; Durwent v. Pratt, 55 Vt., 270; Burke v. Adams, 80 Mo., 504; Winslow v. Cooper, 104 Ill., 235; Thomas v. Bowman, 29 *id.*, 426; Bryce v. Watson, 73 N. Y., 597; Pennell v. Hinman, 7 Barb., 644.)

Taking the paper from Terrill to testify is rather evidence that the purchasers knew of the fraud. (Wait Fr. Conv., 241; Bump, 51; Twyne's Case, 1 Sm. L. Cas., 92; 8 Enc. L., 770; 21 N. J. Eq., 367; 76 Ala., 103.) Plaintiffs in error cannot complain upon the ground of any theory they may have of the law as to the admissibility of evidence to explain the consideration of the deed, since such evidence was admitted. But the evidence should not have been admitted. (Kerr F. & M., 192; Wait F. C., 221; Houston v. Blackman, 66 Ala., 559; Porter v. Gracie, 58 *id.*, 307; 26 N. Y., 368; 89 Ala., 434; Betts v. Bank, 1 Har. & G., 175; Galbraith v. Cook, 30 Ark., 424; Davidson v. Jones, 26 Miss., 63; 2 Phil. Ev., 689.) To support a marriage settlement, the contract must be in writing. (R. S., Sec. 2953.) As against creditors, neither the transfer of the property before, nor the subsequent marriage, will render the transaction valid. (Deshow v. Woods, 1 L. R. A., 518; Finch v. Finch, 10 O. St., 506; Henry v. Henry, 27 *id.*, 121; Bump, 303; Kerr, 202; Randall v. Morgan, 12 Ves., 67; Dygert v. Remerschnider, 32 N. Y., 629; Satterwait v. Emly, 4 N. J. Eq., 489; Read v. Livingston, 3 Johns. Ch., 481; Thompson v. Dougherty, 12 S. & R., 448, Chambers v. Salle, 29 Ark., 407; Flemer v. Flemer, 29 Ind., 564; Maley v. Lively, 15 Fla., 168.)

The property conveyed to Mrs. Terrill being practically all the property of the husband, it is to be deemed fraudu-

lent as to creditors.  A man may make a reasonable settlement for the woman he is about to marry; but when he conveys to her property out of all proportion to that owned by him, it furnishes strong presumption of fraud. Mrs. Terrill knew some of the debts of Terrill, and must be presumed to have known what effect the conveyance would have upon his creditors.  (Crawford v. Beach, 8 Pac., 537; Phillips v. Meyers, 82 Ill., 67; Coates v. Gerlach, 44 Pa. St., 43; Lewis v. Caperton, 8 Gratt., 148; Nichols v. Nichols, 61 Vt., 426; Patrick v. Patrick, 77 Ill., 555; Kerr, 257; Wait, 382, 380; Bank v. Watson, 13 R. I., 96; Lloyd v. Fulton, 479; Allen v. Walt, 9 Heisk., 242; White v. Bettis, *id.*, 645; McCowan v. Hill, 16 S. C., 802; Kline's Est., 64 Pa. St., 122; Fisher v. Schlasson, 41 O. St., 147; North Pl. Ele. Co. v. Price, 4 Wyo., 293.)

The conveyance to W. B. Personette conveyed no title, good either as against Terrill or his creditors.  (Hill v. Fouse, 32 Neb., 637; Clark v. King, 34 W. Va., 631; Gettleman v. Gitz, 78 Wis., 439.)

CORN, JUSTICE.

This suit was brought by Mrs. Blackburn, guardian of Lucy S. Terrill, a minor, and B. A. Currie, creditors of James Terrill, to set aside certain conveyances as fraudulent.  They allege that Terrill, in pursuance of a conspiracy with one Mary Personette to defraud his creditors, conveyed to her, without any valid consideration whatever, all his property.  That within a short time after such conveyance they intermarried, and she immediately proceeded to sell all his personal property at public auction.  That afterward, in pursuance of the same purpose, she conveyed the land, without any valid consideration, to her son, Wilson B. Personette.

The plaintiffs in error, Metz and Lonabaugh, upon their own application, were made parties defendant, and allege that they are the owners of the land, having purchased it from Wilson B. Personette.  They further set

out that on July 23, 1896, Terrill and Mrs. Personette entered into a contract, whereby he agreed to convey to her the land in question upon consideration that she would marry him; that in pursuance thereof he executed the conveyance to her on September 10, and they were married on September 17. Prior to the filing of the answers of Metz and Lonabaugh, Metz, as attorney for Terrill, had filed an answer for him denying any indebtedness to plaintiffs, and setting up that the conveyance was made in pursuance of the marriage contract. Subsequently, Terrill filed a cross-petition alleging that his former answer was false, and filed by Metz without authority and with the purpose to defraud him, Terrill. In his cross-petition he further alleges that he entered into a marriage engagement with Mrs. Personette in Chicago, on July 23, 1896, she professing great affection for him, and representing that she had a large amount of property and money, and would make a home for, and bring up and educate, his minor child, Lucy S. Terrill. That, by her representations and her protestations of affection, she obtained complete control over him, so that at her dictation he delivered the deed to her on September 17, and still relying upon her representations they were married on the same date; that the deed was without consideration, and was not his voluntary act or deed. That, shortly after the marriage, she appropriated all his personal property and disposed of it for her own use. That all of her representations were false, and made for the purpose of defrauding him, but that he did not fully discover their falsity until about July of the following year, when she abandoned him. That she conspired with Metz and her son to defraud him and defeat his creditors, and, in pursuance of such conspiracy, deeded the land to her son, without consideration, and the son, with the same purpose, conveyed to Lonabaugh for himself and Metz. That Metz, with full knowledge of the facts, urged Terrill to put his affairs into his hands as his attorney, at the same time concealing from him the fact that he had acquired an

interest in the land.   He further alleges that any pretended contract with Mrs. Personette for the conveyance of the land to her is void because not in writing.

After the evidence was heard, the plaintiffs, by direction of the court, amended their petition by charging that, at the time of the conveyance to Lonabaugh, who was a practicing lawyer, he agreed to appear, and defend the attachment suits of the plaintiffs against the land, and to pay the Currie claim in case it should be determined to be a valid lien upon the land; that he had suffered the same to go by default, wherefore he and Metz were estopped from questioning the validity of the judgment in that suit.

The court stated in writing its findings of fact and conclusions of law, decreed in favor of the plaintiffs and the cross-petitioner, and directed that Metz and Lonabaugh convey the land to Terrill, and that it be sold to satisfy plaintiffs' claims.

Upon the hearing, the plaintiffs in error, Metz and Lonabaugh, introduced in evidence a paper purporting to be a marriage contract between James Terrill and Mary Personette, and which is as follows:

"July 23, 1896, 6323 St. Lawrence Avenue, Chicago, Illinois.

"This is to certify that I, James Terrill, of Banner, Sheridan County, State of Wyoming, has and do propose marriage to Mary Personette, of Chicago, Cook County, State of Illinois, and offer her, the said Mary Personette, as a marriage settlement, to give to her in fee simple and to be legally hers in her own right, the whole of my ranch, situated in sections thirty-one, thirty-two, and thirty-three in township 54, and one-quarter section in section 5, township 53.   Each section being in range 83, and known as the Terrill ranch, on which is located the post office of Banner, all above-described real estate being in Sheridan County, State of Wyoming, together with all improvements, machinery, grain, and stock thereon or

belonging thereto. To be legally hers forever in her own right to do whatsoever she may please with, free from any legal interest that marriage might entitle me to, and after marriage I hereby relinquish all interest that a husband might claim, and furthermore declare that there are no liens, claims, or incumbrances of any kind against the said property except a mortgage of about fifteen hundred dollars; and the said Mary Personette, in consideration of the above-described settlement and mutual love, accepts the above offer of the above said James Terrill, and agrees to marry him some time during the month of this coming September, 1896. This being an antenuptial contract between the above said James Terrill and the above said Mary Personette, which we both hereto sign, and she agrees to relinquish her right in any other property he may have. James Terrill, Mary Personette.

This paper was in the handwriting of Terrill, and it is not questioned that the signatures were written by Mrs. Personette and himself respectively. But Terrill testifies that it was prepared and signed, not as purported on the 23d day of July, 1896, but about the 20th of February, 1897, long after the marriage, and for use in defeating the attachment suits which had been commenced a short time before. The court found that it was executed as stated by Terrill about the 20th of February, 1897.

All the evidence shows that these two persons met about July 10, 1896, he having gone to her house for a meeting with her, arranged by a so-called matrimonial agency, with which he had been corresponding. He avers in his cross-petition that they became engaged on July 23, and he testifies that the understanding was that she was to come to Sheridan in September, and if she was pleased, they would be married. In her deposition, taken some time before the trial, and her attention not being called by any question to the fact that Terrill would deny the execution of a written contract at that time, she states that he offered to deed her the ranch while he was in Chicago in July, but that she refused to accept it, not

being .sure that she would be willing to carry out her promise to marry him after she came to Sheridan. But she suggested that he put something in writing so that, if she came out, she would have some evidence that he was in earnest, and that they sat down and prepared the contract together.

Furthermore, in his correspondence with Metz instructing him how to proceed in contesting the Currie and Blackburn claims, Terrill frequently referred to the contract as made prior to the marriage. In his letter of February 22, 1897, he says: "To begin with, my wife and I had a marriage contract signed the 23d day of July, 1896, that gave her exclusive title and ownership of all the property, a fact that will or ought to defeat both notes against the property. * * * In that marriage contract I relinquished, as a husband, all rights in the lands, etc., after marriage to my wife. A copy of the contract will be sent to you. If it ought to be put on record, let us know." In his letter of February 23, he says: "I inclose you a certified copy of our contract for your use if necessary." And in a postscript to the same letter, he says: "Inclosed is two dollars for recording marriage contract." In his letter of February 27, he urges as one of the reasons why these suits ought not to be maintained: "Because I have no legal claim or right in the property which can be substantiated by the marriage contract and the conveyance to Mr. Personette." Again, in his letter of March 1 he says: "I had attorneys here to examine the laws of Wyoming, and they said nothing can get a judgment against the contract, and the deed following it, and the marriage being consummated, and her being innocent of knowing anything of my debts, and she had a right to sell, or dispose of it as she pleased." March 6, he writes: "It is simply folly and expense when the case will eventually settle back to the proper place, the marriage contract." In these letters he repeatedly calls attention to the desirability of taking his own and his wife's depositions to the facts, and on March 8 he writes

to Metz : " Can't you have our depositions all taken so complete as to wind it all up on the 27th of March, that will satisfy that I have no title or interest in that ranch, and that it now wholly belongs to Wilson B. Personette, and that the title entirely passed from me at the time the marriage contract was consummated by our marriage ? Be sure and have our depositions taken in plenty of time, etc." About the end of March he left Chicago, and went to Colorado, and there, on July 7, he signed and made oath to an affidavit, prepared for the purpose by Metz, in which he states that he had proposed marriage, and been accepted by Mrs. Personette, and then proceeds: " That in pursuance of said agreement, this affiant and said Mary Personette on the 23d day of July, A. D. 1896, in the city of Chicago, Ill., made and entered into a mutual contract in writing, a copy of which contract is attached hereto and marked Exhibit ' A,' and made part hereof." He then in his affidavit sets out the terms of the marriage contract.

Mr. Menardi, the notary public who drew the deed from Terrill to Mrs. Personette, about September 10, 1896, testifies that Terrill said to him at that time that the actual consideration for the deed was the fulfillment of the marriage contract which he had previously entered into with her; that it was a written contract, and that by its terms he had agreed to turn over his entire property to her in consideration that she would marry him.

This evidence, coupled with the fact that the contract itself in the handwriting of Terrill is produced upon the trial, and that it was acted upon and performed by the delivery of the deed, and the marriage of the contracting parties on September 17, in our opinion, overwhelmingly contradicts and refutes the statement of Terrill that it was executed for a fraudulent purpose long after the marriage on February 20, 1897. Upon the other hand, there is, as we believe, no single circumstance which corroborates Terrill's statement. The fact that the description of the land is general in the contract, and not particular and

specific as in the deed to Mrs. Personette, and in the deed from her to her son, while of slight importance perhaps, tends to show that when the contract was drawn, an accurate and precise description was not at hand; which was the case in July, 1896, but was not the case in February, 1897, as shown by the fact that she had a short time before executed a deed containing a precise description to her son. We think the evidence was insufficient to sustain the finding that the contract was not executed as purported upon its face; but we think it must be taken as one of the established facts in the case that these parties entered into this written contract on July 23, 1896.

Terrill, in his cross-petition, avers that the conveyance of the real estate by him to Mrs. Personette was not executed on account of any marriage contract, and that such conveyance had nothing whatever to do with the marriage contract or the marriage; but that, his will being completely controlled by her, he executed the deed on September 10, and delivered it to her on September 17, solely at her dictation and without any consideration whatever. He alleges, however, that while in Chicago, he stated to her fully his situation, his property, his debts, including the indebtedness to Currie and to his daughter, and his desire to marry again, chiefly in order to secure a mother's care for his child; that she represented to him that she was of good character and family, that she had $200,000 in her own right, and large experience in business, would care for and educate his child, pay all his debts and invest money for him and place him in business, at the same time professing great affection for him; and that relying upon her representations, he entered into an engagement with her whereby they were to be married at a time to be mutually agreed upon. He does not allege that by this engagement he was to convey to her any property whatever. In testifying as a witness in the trial, he stated as follows in reply to questions of his counsel: —

"Q. What, if anything, occurred between you and

Mrs. Personette on the 23d day of July, 1896? Ans. Nothing, sir, only I left to come home. Q. What, if any, proposition of marriage had been made at that time and prior to that time by you? marriage arrangement? Ans. There was no arrangement. There was just an understanding that if she came out and was pleased, the matter would be consummated."

He further testifies that she came out, and he showed her the property, and when asked what occurred on or about the 10th of September, he replied: "When I consulted her and she was satisfied and very well pleased, I proposed marriage, and then she, the first time, she ever proposed deeding any property to her."

He further states that her request surprised him, and that he consulted his friend, Mr. Menardi, and others about it, and that he plead with her to let him handle the property, but "she insisted, and I finally got Menardi to make a deed, but still hesitated, and finally, with her promises and the attachment that existed, I finally made the deed."

When questioned by his counsel as to what promises he referred to as causing him to make the deed, he answered: "She promised she would pay off these claims, establish a fine business, live in fine style in Chicago, and care for my child."

He was subsequently asked by his counsel: "Q. Explain to the court what made you sign that deed. How did it come you signed that deed? Ans. It was the fascination and infatuation I had toward the woman. She acted lovingly and affectionately, and said it would break her heart if she went back without me. It was a kind of control or spell she had — something I don't understand."

The court found upon this subject, however, that the consideration for the conveyance was her representations and promises to the effect that she was greatly in love with him, would marry him, and make him a loving and faithful wife, would care for the child, and make it a good home; that she had large means, and would pay off his

debts, and put him in a paying business in Chicago. But the court did not find that the conveyance was without consideration, or executed under her control and at her dictation. The evidence shows that they were married a few hours after the deed to her on September 17th, and lived and cohabited together, certainly until sometime in December, three or four months after the marriage, when Menardi testifies that he visited them in Chicago, and found them living together as man and wife, and very agreeable to each other. The argument of counsel for defendants in error, therefore, in so far as it is based upon the assumption that the conveyance was without consideration, is entirely unsupported, either by the findings of the court or the evidence in the case; for marriage is not only a valuable consideration, but a valuable consideration of the highest character. Magniac v. Thompson, 7 Pet. (U. S.), 348; Rockafellow v. Newcomb, 57 Ill., 191; Sterry v. Arden, 1 Johns. Chy., 271; Verplanck v. Sterry, 12 Johns., 536; Tolman v. Ward, 86 Me., 303; Prewit v. Wilson, 103 U. S., 22; Bunnell v. Withrow, 29 Ind., 132.

But the court further found that all of her representations which induced the making of the conveyance to her were false, except her promise to marry him, and that she permitted the marriage ceremony to be performed, uniting her to Terrill, not in good faith, but as a means of defrauding him of his property; and reached the conclusion as matter of law from the facts so found that the conveyance was fraudulent, and conferred no title upon her as against the right of Terrill to the lands.

We are of the opinion that the finding of fact is not sustained by sufficient evidence, and unless it be construed as a finding that the marriage was a mere formal ceremony not consummated by subsequent cohabitation, which the evidence conclusively rebuts, it does not sustain the conclusion reached by the court. While there is evidence tending to show that a strong personal affection had sprung up between the parties, yet we think it is apparent that

the motives for this marriage were largely mercenary, or at least of a very practical character. He was fifty years of age, and had been twice married. She was fifty-six, as testified to by Terrill, though she represented to him that she was but forty-seven, and had a former husband, from whom she had been divorced, living in the State of Indiana. Terrill states that she represented herself to be worth two hundred thousand dollars. She testifies that he represented himself to be a man of great wealth, a leading citizen of his State, and that he had "vast inheritance" in addition to the property which he proposed to transfer to her, and, in the marriage contract she relinquishes all claim to any other property owned by him. The court finds that she was possessed of but little or no property, but there is substantially no evidence upon the point. Terrill makes no statement in regard to it. It is true that in her deposition Mrs. Terrill states that when, in Chicago, he desired to deed her the ranch, she stated to him that she would not know what to do with it; that she could not pay off the mortgage, and that he said he would pay it off himself. But if this evidence is to be accepted as true, it equally rebuts the allegation that she represented that she was wealthy, and also that she promised to pay off his debts, which she testifies she knew nothing about, with the exception of the $1,620 mortgage.

The court also finds that she represented to him, and made him believe, that she would take care of and educate the child, and make it a good home, and that she did not perform this promise, and did not intend to do so. But the child was in the custody of its guardian, Mrs. Blackburn, and there is no evidence whatever in the record that Mrs. Terrill was ever requested to take it, or had any opportunity to do so. Indeed, on February 27, 1897, some five months after the marriage, in a letter to one W. O. Dimmock, Terrill states that he and his wife had expected to take the child at the beginning, and that he blamed himself for consenting to let it remain for a while with its relatives in opposition to her judgment.

The court also finds that one of the promises in consideration of which the conveyance was made, was to pay off his debts, and that she never performed or intended to perform this part of her agreement.   The evidence strongly tends to show that the woman looked upon it as her duty, under the agreement, to pay his debts, or at least that such was her intention, if there were any.   And it appears that, after the marriage she was about the town of Sheridan looking up his indebtedness, and at the same time complaining that Terrill had deceived her, items of his indebtedness having been brought to her attention which he had concealed from her.   Terrill sets out in his cross-petition that prior to the conveyance he informed her fully of all his indebtedness, mentioning specifically the Currie and Blackburn claims.   But, in his testimony, he states that the Blackburn claim, due to his minor child, was never mentioned to her until sometime after the marriage.   And several months after the marriage he wrote repeated letters to Metz, as his attorney, in attempting to defeat these two claims, that he owed Currie nothing, but that Currie was indebted to him upon a fair settlement. Just prior to the marriage she inquired particularly of Terrill, as shown by the testimony of Menardi, whether there were any charges or claims against the land which were not of record, and he replied that there were no liens upon the land which were not of record.   And she testifies that, in her questions as to whether there were any claims, liens, or judgments against the property, she tried to cover everything, and that she was informed there was nothing; that she had no knowledge of any debts except the mortgage to the bank.

The finding of the court that she permitted the marriage ceremony to be performed not in good faith, but as a means of defrauding Terrill of his property, is not only not sustained by the evidence, but is entirely inconsistent with numerous circumstances in the case, about whose existence there is no question.   Not only was the marriage ceremony performed, but they lived together as husband

and wife in Sheridan for a time, and then went to the ranch, where they resided for some weeks, and until she went to Chicago in November. After assisting to close out matters at the ranch, Terrill followed her to Chicago, where Menardi found them in December living together as husband and wife and upon apparently agreeable terms. They resided together in Chicago until the end of March, though Terrill intimates that all sexual relations between them ceased the latter part of December. About the first of April he went to Colorado, and they did not afterward live together, though there was a frequent exchange of letters. The only one of these letters that is in evidence, which Terrill testifies he received from her about the time of her visit to him in Colorado in July, is affectionate in tone, states that she has been making efforts to get out to see him, and complains that she has not received a letter from him for three weeks. Terrill states that he was infatuated with her, and she testifies that they were in love with each other when they entered into the marriage contract in July, 1896. All this is entirely inconsistent with any conclusion that the marriage ceremony between them was a mere form. In view of all the facts we are forced to the conclusion that the findings of the court disregard a great mass of evidence which was entitled to consideration, much of which is entirely uncontroverted, and which substantially modifies the testimony of Terrill upon which the decree seems to be based.

But independent of any question of the mere weight of the evidence, we do not think the findings of fact sustain the conclusion reached by the court, that the conveyance conferred no title upon Mrs. Personette as against the right of Terrill to the lands. All the evidence in the case shows that the transfer was made in consideration of her promise of marriage. Such transfers stand upon somewhat different ground from other conveyances, owing to the fact that, if set aside, there can follow no dissolution of the marriage, and the parties cannot be placed in their former positions. Prewit v. Wilson, 103 U. S., 25.

The mere presence of fraud in the marriage contract is not sufficient to dissolve it. The fraud must exist in the common law essentials of it, and false representations in regard to family, fortune, or external conditions are not sufficient. Carris v. Carris, 24 N. J. Eq., 522. As stated by Kent: "It is said that error will, in some cases, destroy a marriage contract, and render the contract void, as if one person be substituted for another. This, however, would be a case of palpable fraud, going to the substance of the contract; and it would be difficult to state a case in which error simply, and without any other ingredient, as to the parties, or one of them, in respect to the other, would vacate the contract. It is well understood that error, and even disingenuous representations, in respect to the qualities of one of the contracting parties, as his condition, rank, fortune, manners, and character, would be insufficient. The law makes no provision for the relief of a blind credulity, however it may have been produced." 2 Kent Com., 77. In the case of Wier v. Still, which was a suit brought to annul a marriage upon the ground of fraud, the defendant represented that he was a man of good character and standing in society, and that he had plenty of means, and would maintain and educate her child well. It appeared from the evidence that he was a convict recently released from the Iowa penitentiary, where he had served three terms. The court held that a ruling dismissing the plaintiff's petition was correct, and this, too, in a case where the parties had never lived or cohabited together at all. Wier v. Still, 31 Iowa, 109. In the leading case of Reynolds v. Reynolds, 3 Allen, 607, it is said, "In the absence of force or duress, and where there is no mistake as to the identity of the person, any error or misapprehension as to personal traits or attributes, or concerning the position or circumstances in life of a party, is deemed wholly immaterial, and furnishes no good cause for divorce. Therefore, no misconception as to the character, fortune, health, or temper, however brought about, will support an allegation of

fraud on which a dissolution of the marriage contract, when once executed, can be obtained in a court of justice. These are accidental qualities, which do not constitute the essential and material elements on which the marriage relation rests.'' And Bishop says that all the authorities lead to this conclusion.    1 Bish. M. & D., 167; Varney v. Varney, 52 Wis., 120.

And, therefore, as the marriage was the consideration for the conveyance of the property, and as it was fully consummated by the subsequent cohabitation of the parties for several months, and is neither void nor voidable, there is no ground for setting aside the conveyance.    Barnes v. Barnes, 110 Cal., 420.

But it is urged by counsel for defendant in error, and it seems to have been the view taken by the court, that the failure of Mrs. Terrill to perform certain promises, which the court finds accompanied the promise of marriage, and, in part, induced the conveyance to her, furnishes sufficient reason for setting aside the conveyance.    As already observed, the proof of any such promises is very meager. Accepting Terrill's testimony alone as presenting the true state of facts, it appears that in Chicago they talked the matter over repeatedly, and, without any engagement of marriage, simply arrived at an understanding that she should come to Sheridan, and if she found things satisfactory, they would be married.    That having expressed herself satisfied, he then proposed marriage, and she, for the first time, proposed the conveyance of any property to her.    According to Terrill's account, therefore, the promises and representations, in Chicago, were not in view of any conveyance of property, but of marriage simply.    In his cross petition, verified by his own affidavit, he alleges that the conveyance had nothing whatever to do with the marriage or any marriage contract whatever.    And he testifies that he signed the deed by reason of her control over him.    But he also testifies that '' with her promises and the attachment that existed '' he finally made the deed.    And the court found that the promises were, in

part, the consideration and inducement for the transfer. But, even in this view of the testimony, we think the finding does not sustain the conclusion reached by the court. It is clear from the evidence that the promise of marriage was the principal and primary consideration, and upon it all the rest depended. As expressed in an Ohio case : "The agreement was entire; the intended marriage entered into and formed a part of the consideration on both sides, and without it the agreement would never have been made." And the court in that case held that, though marriage was not the sole consideration, yet it was clearly an agreement upon consideration of marriage under the Ohio statute. Finch v. Finch, 10 Ohio St., 505; Henry v. Henry, 27 Ohio St., 129. It is clear from the evidence that the various representations and promises found by the court were merely incidental to the consideration of marriage, and there is no intimation in the testimony that Terrill at any time demanded the performance of any of them, or that he left Chicago by reason of any refusal upon her part to make them good.

But it is contended that the conveyance in question should be set aside because fraudulent as to Terrill's creditors. Upon the fundamental proposition that, by reason of this conveyance, he became insolvent and unable to discharge the claims of the plaintiffs, we are unable to reconcile certain material findings of the court. It was found, as already observed, that the marriage contract produced in evidence by plaintiffs in error was not entered into prior to the marriage, but was manufactured some months afterward. Excluding this contract from consideration, we are unable to find any evidence in the record sustaining the finding of the court upon this subject. The finding is that Terrill conveyed the real estate in question, of the value of $6,000 and his personal property of the value of $2,000, to Mrs. Pensonette on September 17, 1896, and that at the time of making such conveyance the only property possessed by him not conveyed to her was an interest in a piece of land of the

value of two hundred dollars ; that after such conveyance he was wholly unable to pay plaintiffs' claims. This finding was necessary to the right of the plaintiffs to the relief prayed for. Now if the marriage contract, dated July 23, 1896, was entered into prior to the marriage, this finding may be sustained, as by its terms the contract includes substantially all the personalty subsequently transferred to her. But the court by its findings excludes it from consideration, the deed to the land makes no mention of the personal property, there is no bill of sale or other writing purporting to convey it, and Terrill testifies that it was transferred to her after the marriage and only a short time before the sale in November, 1896. So that while it may appear from the evidence, accepted by the court as true, that the transfer of the personal property after the marriage left Terrill insolvent, it by no means appears that he was rendered insolvent by the conveyance of the land. The court fixes the value of the personalty at $2,000 and Terrill testifies that he had $800 in money, and that the value of his personalty, including money, was about $3,000. This left him ample funds to pay the claims of plaintiffs after the transfer of the real estate. It is only by treating the marriage contract as genuine and the basis of the subsequent marriage and conveyance of property, that any evidence is obtained that Terrill denuded himself of substantially all of his property at the time he conveyed the land. But this contract cannot so be accepted as genuine for the one purpose and rejected as false and fraudulent for others.

But conceding, as we think the evidence shows, that by the contract and the subsequent marriage and transfers of property in pursuance of its terms, Terrill became insolvent and unable to pay his debts, we do not think the conclusion of the court is sustained that the conveyance must, as to creditors, be deemed fraudulent. Where a conveyance is without consideration, very slight evidence will generally be deemed sufficient to avoid it as to creditors. But in this case the conveyance was made in consid-

eration of marriage, the highest consideration known to the law, and a different rule is applicable.

It must appear, first, that it was executed by the grantor with intent to hinder, delay, or defraud his creditors, and in the second place that the grantee participated in the fraud. In his cross petition, and in his testimony upon the trial, Terrill states that the arrangement was that Mrs. Personette was to pay off all his debts, she claiming to have ample funds for the purpose, and that he had informed her fully and in detail what his indebtedness was. In this view of the evidence, and it is the view adopted by the court, there was no purpose whatever upon the part of Terrill to hinder or delay the collection of any claims against him, but he supposed he had fully provided for the prompt payment of all of them. Indeed, the court does not find that the conveyance was made with any intent upon the part of Terrill to hinder, delay, or defraud his creditors. We think such a finding was necessary to support a judgment in favor of the creditors. In the Am. & Eng. Ency. of Law, the rule is stated as follows: "The next and most essential requisite of a fraudulent alienation is that it should be made with a covinous intent. The fact that creditors may be delayed or hindered by a conveyance is not sufficient of itself to vitiate the deed if this element be lacking. Inconvenience to creditors may result from a conveyance that is fair as well as from one that is fraudulent, for every disposition of a debtor's property, however valuable the consideration and honest the motive, diminishes the fund out of which payment of his liabilities can be enforced.

"Hence the validity of the conveyance is to be determined, not by its effect, but by the intention with which it is made." And the author immediately adds: "But a fraud such as will authorize a creditor to set aside a conveyance made by his debtor must be one directed by the debtor against his creditors, and not one practiced by third parties against the debtor. If a debtor has been overreached in a transaction, he may avoid it himself, but

a creditor of his has no standing to do so." 14 Am. & E. Ency. of Law (2 edition), 265–6. And the authorities fully sustain this view. Bump Fr. Con., Sec. 20; Wait Fr. Con., Sec. 403. It seems to follow necessarily that if no fraud was practiced by the grantor, the creditors have no standing in court as against the grantee, Mrs. Terrill, as it was necessary that both parties should be implicated in the fraud. Wait Fr. Con., Sec. 183.

We have considered this case thus far as if the rights and interests of the original parties to the transaction were alone involved, and leaving out of consideration the connection of the plaintiffs in error, Metz and Lonabaugh, with the property in controversy. As matter of fact, plaintiffs in error purchased the land in March, 1897, paying for it to Mrs. Terrill or her son $3,000 in cash, assuming the payment of the bank mortgage of $1,620 with some accrued interest and other small amounts, which made the consideration paid or assumed by them, in the neighborhood of $5,000. The property is shown to have been worth about $6,000. They also bought with notice of the claims of Currie and Mrs. Blackburn, agreeing that if the Currie claim should be found to be a valid and subsisting lien against the property, to protect the vendor against the same. It is charged and so found by the court that the purchase by Metz and Lonabaugh was not in good faith, and that they took no title as against Terrill or his creditors. In the absence of such proof of fraud as would avoid the conveyance as between Terrill and his wife, and we think it is clear there is no such proof, it is difficult to conceive of a case where it would be voidable as to subsequent purchasers for a valuable consideration. But there is a great deal of evidence in the record directed to the question of the good faith, especially of Metz, in making the purchase. It is charged by Terrill in his cross-petition that Metz, pretending to be his attorney, without his knowledge or consent, filed an answer for him in this action, not in the interest of Terrill, but for his own corrupt purposes and to defraud Terrill out of the land in ques-

tion; that this answer contained the following false statements: that is to say, it falsely alleged that he was not indebted to Mrs. Blackburn, the guardian, in any sum whatever; that the land in question was not the property of Terrill, and had not been since September 10, 1896; that he had had no interest therein since that date; that he had offered to convey the land to Mrs. Personette upon consideration that she would marry him, that she had accepted such offer, and the contract of marriage was entered into between them by reason thereof; that, in pursuance of such offer and acceptance and such contract of marriage, they were married on September 17, 1896; that, in pursuance of such contract and of the marriage, he conveyed to her the property; that he did not inform her that he was indebted to any person whatever prior to the marriage; that he was not indebted to Currie; that at the time of such conveyance he retained sufficient property to discharge all his obligations; that the deed to Mrs. Personette was in consideration of marriage, was accepted by her in good faith, and was good and valid, and that he has paid Currie all that is justly due him.    Terrill alleges in his cross-petition that all these statements were false, and known by Metz to be false at the time he filed the answer.    But the fact is that he had informed Metz that all these statements were true, and his letters to Metz, in his own handwriting, containing the statements, are in evidence in the cause.    Some extracts from these letters have already been incorporated into this opinion in discussing the evidence in reference to the written contract of July 23, 1896.    Furthermore, in his letter to Metz, of February 22, 1897, from Chicago, he writes: "This authorizes you to take exclusive charge of the actions commenced against me in the court of Sheridan County for settlement immediately, out of court, if possible; if not, you will not leave a stone unturned to win them." On February 23, he writes to Metz: "I find from a letter received this morning that there is a universal prejudice against my wife and myself.    Now you can rest assured

there is no ground for it, and when you come to Chicago, you will be convinced I was a very fortunate man in securing the wife I did, and I am not only satisfied, but honored." And he adds in the same letter: " You proceed to do what is necessary at once in regard to the Currie & B. notes. If the case is tried, we propose to defeat them, but rather settle it if you can out of court, and I count on you as a confidential friend that can keep our business to yourself." On March 1, he wrote again to Metz: " You file an answer that I have no title or interest in that ranch, and you are going to prove it, and have mine and my wife's deposition taken here, and the records there and the laws of that State will prove it. I have not the least idea of letting those notes go by default, for I expect to fight them to win. * * * And so far the four-hundred-dollar note, I can offset that easily if brought into court." In the same letter he states the account between himself and Currie, and finds that he had overpaid Currie $38.33. Writing again to Metz, on March 3, he says: " Since getting a letter from Quincy, Illinois, have been figuring it over again, and now I make it $234.74 that Currie owes me. I often thought I had paid it all and more too, but never stopped to calculate it, and always took Currie's word and statement for it, never dreaming they would bring such an account against me." Terrill's letters in this strain are voluminous. He states that they were written at the dictation of his wife, and are, for the most part, without any foundation in truth. But they were the information which Metz employed in drawing Terrill's answer in this case, and there is no intimation in the evidence that he had any different information in regard to the subjects involved.

On March 15, a few days after the letters referred to were written, Lonabaugh purchased the land for himself and Metz. It is charged, and the court found, that the purchase was not made by them in good faith, that the transfer was fraudulent as to Terrill and his creditors, and decreed that they convey the property to Terrill. The

evidence upon this subject shows that some time after the
marriage Mrs. Terrill listed the property with Mr. Me-
nardi, who was in the real-estate business in Sheridan,
and it was in his hands for sale with the knowledge and
approval of Terrill.   He was in Chicago the first week in
December, and he states that while there Terrill expressed
to him his anxiety that the property should be sold.   He
attempted to sell it while he was East, but failed to make
a sale.   After returning to Sheridan, upon a casual meet-
ing with Lonabaugh, whose office was in the same building
with his own, he mentioned to him his desire to sell the
land.   Lonabaugh suggested that he had under his control
a piece of land in Iowa, belonging to Metz, and that an
exchange might be arranged.   And, the proposition for
an exchange not meeting the approval of Mrs. Terrill,
this conversation led to the purchase which was subse-
quently made.

Under these circumstances there is no apparent reason
why Metz or Lonabaugh or any one else might not buy
the land free from any imputation of fraud or bad faith.
While it was common talk in the community, in which
they perhaps joined, that Terrill was acting foolishly in
his marriage and in parting with his property, there is no
intimation in the evidence that either Metz or Lonabaugh
had any other information about the matter than was in
possession of the community generally.

But in addition to the facts already referred to, about
the same time, and some two or three months prior to the
purchase by Lonabaugh, Terrill joined with his wife in a
conveyance of the land to Wilson Personette, both of
them executing the deed.   In March, Lonabaugh visited
the Terrills at their residence in Chicago, meeting with
both Mr. and Mrs. Terrill and Personette, her son.   And
Terrill, while denying that he had knowledge of the exe-
cution of the deed to Lonabaugh by Personette, admits
that he knew a trade was in progress.   And on March 20,
five days after the execution of the deed to Lonabaugh,
he wrote to Metz: "Of course, you are aware by the mes-

sages passing between here and there that everything is turned over to E. E. Lonabaugh in regard to the B. A. Currie suit, and the Terrill ranch affair.'' Furthermore, at the time of the sale to Lonabaugh, Terrill and his wife with special reference to the suits of Currie and Mrs. Blackburn, executed a writing agreeing to testify the best they could in support of Lonabaugh's title, and Terrill assigned to Lonabaugh the water rights appurtenant to the land. In view of all these facts it would be a surprising conclusion that Lonabaugh's purchase for an adequate money consideration was in fraud of the rights of Terrill. The latter testifies that in all these matters he acted under the dictation and control of his wife. But it has never been held, so far as we are advised, that a grantor can avoid his solemn deed by his own unsupported assertion that he was unduly influenced to make it. And even if such unsupported statement could, as a matter of evidence, be accepted as sufficient proof of the fact of undue influence, yet, as between himself and a grantee, purchasing upon the faith of his representations, and indeed at his instance, for he joined in listing it with the agent for sale to any one who would buy, the equities are all with the purchaser who has expended his money upon the faith of Terrill's repeated representations.

It is also urged that Metz, as attorney for Terrill, is chargeable with notice of all Terrill's equities in the premises. But it is to be observed that Metz was employed by Terrill, to defeat the claims of these very creditors, and to sustain the very conveyance which is now denounced as fraudulent. It is impossible to conceive how Metz, by reason of his relation to the case as attorney, can be presumed to have had notice of any equities of Terrill, when, as appears conclusively from the evidence, up to the time of, and long after, the purchase by Lonabaugh, Terrill was asserting that the conveyance was fair and valid, and the whole transaction entirely to his satisfaction. Absolute good faith is justly required of an attorney in all his dealings with his client, but it does not

go to the extent that he must at his peril be able to divine that at some future period his client will desire to repudiate the very transaction he is employed to defend.

Terrill also charges in his cross-petition, filed February 4, 1898, that Metz, while acting as his attorney, concealed from him that he claimed any interest in the land, and that he had no knowledge of that fact until he received the information from another source in December, 1897. But in a letter from Metz, dated October 23, 1897, and introduced in evidence by Terrill, Metz states that he had formerly written him that he had purchased an interest in the land.

We are forced to the conclusion that the evidence is clearly insufficient to impeach as fraudulent, either the cenveyance to Mrs. Personette, or that to Lonabaugh. And she having acquired a valid title, any evidence bearing upon the consideration for the conveyance to Wilson B. Personette, or the intent with which it was executed, becomes immaterial and irrelevant to any issue in the case.

The judgment will be reversed, and the cause remanded with directions to the district court to enter a decree setting aside the levy of the plaintiffs' attachment upon the land in question, dismissing the cross-petition of the defendant, James Terrill, quieting the title of the defendants, W. S. Metz and E. E. Lonabaugh, to said lands; enjoining the plaintiffs and the said Terrill from in any way interfering with the title or possession of said defendants, Metz and Lonabaugh, and in favor of said defendants, Metz and Lonabaugh for cost.

*Reversed.*

Potter, C. J., and Knight, J., concur.