LILLIE J. KINGSLEY ET AL., APPELLANTS, V. CLARA E. NOBLE ET AL., APPELLANTS: MARY E. KLONE, APPELLEE.

FILED NOVEMBER 8, 1935. No. 29170.

*G. M. Spurlock* and *W. W. Wyckoff*, for appellants.

*Sandall & Webster*, contra.

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

PAINE, J.

This is the second decision in this case, the first being found *ante*, p. 130. The issues were made up in a partition suit, but the real contest is over an antenuptial contract. The trial court found this contract, which is set out in full in our first opinion, was null and void, and the judgment was affirmed in our first opinion.

Hermon H. Klone had been married twice, with an issue of seven children from each marriage. His second wife died on April 13, 1915, when he was 72 years of age, but within a couple of months he began looking for another wife. He discussed the matter with H. W. Brott, and this resulted in Mr. and Mrs. Brott sending word to Mary E. Downey, a widow, 56 years of age, with four grown children, to come to their home and meet Mr. Klone, with matrimony in view. Mr. Klone called upon her four times at this place in the next few weeks, and told her at once frankly that he was a widower and looking for a wife. The parties met a fifth time, two weeks before the marriage, at the home of her daughter on a farm near Polk, where she had been staying, and once again when Mr. and Mrs. Brott took her to see the ten-room, all-modern home where Mr. Klone lived in York. Mr. Klone went out to her daughter's near Polk, and they had a few minutes' visit alone that evening. He remained over night and at 7 o'clock the next morning, August 4, 1915, they left for Seward to be married.

At noon they stopped at York on their way from Polk to Seward, and went to the office of W. L. Kirkpatrick, attorney for Mr. Klone, and there the antenuptial contract,

which had been most carefully prepared, was read to both parties, and signed, and acknowledged by the county judge, who came over from the courthouse for that purpose. This very complete antenuptial contract lists all of the property of Mr. Klone, consisting of 160 acres in Washington county, Colorado, valued at $1,500, 400 acres of York county land, valued at $60,000, and a one-third interest in the dwelling in York at $3,000, and also $5,000 worth of personal property, thus itemizing his total property holdings at the value of $69,500.

The contract gave to the prospective wife this quarter-section of Colorado land, which was deeded to her that day by her intended husband, and in consideration of marriage, and set out that the parties "contemplate said marriage for the sole purpose of establishing a home of their own wherein they may have the convenience, comfort and companionship of each other, but they do not, by said marriage, intend to endow or confer upon each other any of the usual interests, estates, and marital rights in the property and estate of each other." They lived together at York for 17 years, 5 months, Mr. Klone dying January 5, 1933, when about 90 years of age.

Mrs. Klone now makes a post-mortem attack upon this antenuptial contract, and attempts to set it aside for the reason that it is unconscionable, unfair, inequitable, and fraudulent, that she had no opportunity to consult with any one who could advise her, that it failed to make adequate provision for her during widowhood, and that the provisions for her are grossly disproportionate to the wealth of said Hermon H. Klone.

Mr. Klone sold her Colorado land and placed the proceeds, $2,000, in a certificate of deposit for her, and she still has left of this a certificate of deposit of $1,160. He gave her a present at one time of another certificate of deposit for $1,000, which she invested in a small home at Polk, and under his will she is to receive $1,500 in cash, making a total of $4,500.

The testimony discloses that Attorney Kirkpatrick ad-

vised Mr. Klone that his property should all be set out in the contract and given high values, and that the property he was giving his intended wife should be listed at a low value, which was done. Mr. Klone had sold none of his real property, and at his death his estate was appraised as follows: Real estate, $26,350; personal property, $9,636.-88; total, $35,986.88, which was much less than it was valued in the contract, while her Colorado land sold for 33 1/3 per cent. more than it was listed for in the contract. There was, therefore, without any question a full disclosure in the antenuptial contract of all of his holdings, with an extremely high value placed on all of it.

The real property was all accumulated by Mr. Klone, with the assistance of his first two wives and the 14 children. The only increase in his property after his third marriage was in his personal property. However, Mrs. Klone testified on direct examination that she had no idea that he had certificates of deposit in his bank box of $1,500 and $4,900 until after his death, as he was a very thrifty German and always led her to think that he was mighty short of funds, and thereby induced her to rely upon her own funds in many instances.

In his will Mr. Klone gave each of his ten daughters only the sum of $300, while to his son Frederick he gave $1,500, to his son Frank, $2,000 and a farm, to his sons Philip and Hermon, Jr., each a farm, the latter son having died June 20, 1926, after the codicil was written, leaving four girls, three being still minors at the time of the trial.

Mrs. Klone testified that at the time of signing the marriage settlement she knew nothing whatever about Mr. Klone or his property. However, the evidence discloses that H. W. Brott, who brought them together, was interested in Mrs. Klone, as his daughter had married Mrs. Klone's son, and that Mr. Brott had been sheriff, member of the county board and of the city council, and a bank director, and was engaged in the real estate business and posted on farm values, and when Mrs. Klone had these visits at the home of Mr. Brott, who sent for her to meet

Mr. Klone with the idea of marriage, she had a well-informed friend at hand, from whom she could have acquired full information as to values of real estate.

She testified that she had known H. G. Hopkins, county judge, very well for 40 years, and they used to go to the same church, and the county judge testified that he knew her, but could not remember of ever speaking to Mr. Klone until the noon he was called over to take their acknowledgments to the antenuptial contract. The contract itself sets out that it "has been carefully read and explained to the parties, and each of them, by the said H. G. Hopkins;" so that she had one in whom she had confidence at hand, who could have explained any detail in the contract before she signed it. W. L. Kirkpatrick testified that Judge Hopkins read it to her, and then he asked whether she had any questions, and her reply was: "It isn't necessary, that's the agreement I have with Mr. Klone, anyhow I understand it."

In the first opinion in this case, *ante*, p. 130, it is set out that certain things are essential to support the validity of an antenuptial contract: First, they must be fairly entered into; second, the terms must be just and reasonable; third, the property provided for the prospective spouse must bear a just and reasonable proportion to the estate of the prospective husband; fourth, the husband must make a full disclosure as to his property.

The reargument upon this case, and the discussion at consultation between the members of this court, have led us to doubt the soundness of the holding that the property provided for a prospective spouse *must* bear a just and reasonable proportion to the estate of the other spouse.

This court first announced this holding in the case of *In re Estate of Enyart*, 100 Neb. 337, to the effect that, if the provision made for an intended wife was grossly disproportionate to the interest in the husband's estate which the intended wife would acquire by operation of law, it placed the burden upon those claiming the validity of the contract to show that a full and fair disclosure was made

of the value of his estate as well as of the value of the estate which she was relinquishing, and this brings us to an examination of the opinion in the case of *In re Estate of Enyart, supra.*

Captain Logan Enyart owned property worth $225,000. His first wife, by whom he had no children, died in March, 1896. When he came from his large farm to Nebraska City he always made his headquarters at the Grand Hotel, conducted by Mr. and Mrs. Kidd, who were very good friends of his, so much so that he often ate at the family table, where he was introduced to Mrs. Richardson by Mrs. Kidd in June, 1897. This woman had a daughter about 15 years of age, and had been deserted by her husband in September, 1895, and procured a divorce from him in March, 1896. Captain Enyart was a very prominent citizen, took great interest in public affairs, and was a neighbor and close friend of Judge O. P. Mason and J. Sterling Morton. Mrs. Richardson had been sewing, cooking and doing chamberwork at the Grand Hotel to pay for the board and room of her daughter and herself, as well as to pay the unpaid bill left by her husband there. She then went to Auburn and kept house for Postmaster Freeman for about six months, during which time Captain Enyart wrote her letters and went down to see her several times. She gave him references to whom he could write and find out about her standing before she came to Nebraska City. He wrote to these references and the answers were entirely satisfactory. Judge Root says in his brief: "She was not an unsophisticated country girl but was a mature and shrewd woman who had tasted both the pleasure and troubles of life." Their marriage took place April 4, 1898, when he was 70 years of age and she was 37. Two days before the marriage Captain Enyart, who employed lawyers rarely, secured a legal form book and dictated an antenuptial contract, which they signed before a notary public. It is very short, and provided that he would pay her $10,000 at the rate of $500 each year on the anniversary of the contract, and then follows these words:

"That the above sum is all that the party of the second part shall ever claim off of the party of the first part or his estate from marriage." The contract further provided that the agreement did not prevent him from giving her presents as he desired. The evidence discloses that they lived together 15 years, until Captain Enyart died, November 9, 1912. It is said that the prospective wife did not know, and had no means of knowing, of the holdings of Captain Enyart, which consisted of stock in banks and ranches and farms scattered in several states.

In the fifth syllabus in this decision, we held: "Where the provision made for the intended wife by an antenuptial contract is grossly disproportionate to the interest in the prospective husband's estate which the intended wife would acquire by operation of law in case a marriage took place, the burden rests upon those claiming the validity of the contract to show that a full and fair disclosure was made to her before she signed it of the extent and value of the property, or that she was aware to all intents and purposes of the nature, character and value of the estate which she was relinquishing if the marriage took place."

Another case cited in our former opinion in the case at bar was *In re Estate of Maag*, 119 Neb. 237. John J. Maag, 58 years of age, married Alice M. Smith, 45 years of age, with two children. They met in Omaha. She had never been in Otoe county, or talked with any one about his land. He simply told her that he had 400 acres of land in that county. He told her that he had a paper for her protection if anything should happen to him. She did not read it, nor did he furnish her a copy of it. She had no one to talk to to advise her about it. He took her back to her home that night and the next morning they went to the courthouse in Omaha, where she signed this paper, and acknowledged it without reading it, nor did any one read it to her, and it was at once filed in the office of the register of deeds. The parties then went to Fremont, where they were married that same evening. He

died November 10, 1927, leaving an estate of $65,000 to $84,000, and the marriage agreement provided that she should be paid $5,000 after his death, and it was stated in this opinion that the amount she received was so grossly disproportionate to the interest which the law would have given her as to lead to the conclusion, whether intentional or otherwise, that it constituted a legal fraud upon her. The facts in this Maag case are so entirely different from the case at bar that they cannot be compared.

Let us examine other Nebraska cases. In *Fellers v. Fellers* (1898) 54 Neb. 694, each of the parties had children by a former marriage. Each owned real estate in their own right. Each desired to keep and control their own real estate, the same as if they had remained sole, and the contract provided that neither was to acquire any right or interest in the property of the other. But it further provided that a will should be executed by Mr. Fellers, containing certain provisions for the benefit of Mrs. Fellers. The will was executed July 31, 1890. The parties had been married on February 5, 1890. He died December 5, 1892. It was held that this antenuptial agreement was but an executory contract, completed by the making of the will after their marriage, and therefore unenforceable, and not effective to bar the dower right of Mrs. Fellers.

In *Isaacs v. Isaacs* (1904) 71 Neb. 537, the parties were married in April, 1900. The wife preferred to live in Ohio, then came to Nebraska and lived with her husband for a couple of months on his farm in Wayne county, and then returned to Ohio. It was held that an antenuptial agreement may alter the interest which either the husband or wife takes in the property of the other, but cannot vary the terms of the conjugal relation itself, and therefore an antenuptial agreement by a man about to be married that after marriage he will reside in a particular state cannot be enforced.

In *Rieger v. Schaible*, 81 Neb. 33, we find a very long opinion of some 27 pages, citing more than 100 cases and discussing many of them. It involves an antenuptial con-

tract between two parties who each owned real estate and personal property in their own right, had each been married before, and in this contract each waived all right to the property of the other. No children were born of this union, and the husband died February 7, 1905, leaving personal property of the value of $21,000, out of which the widow asks support and maintenance, and to which the heirs objected on the ground of the antenuptial contract. Both the probate court and the district court held the marriage agreement void. No evidence was introduced by the appellee to show that she was deceived or overreached. The antenuptial contract had been read over to her and all of its provisions fully explained. There was no suggestion of fraud or concealment, and the parties being advanced in years the marriage seems to have been in the nature of a business transaction. This court held that the agreement was based upon a sufficient consideration, and was executed in good faith, and that she understood its terms and should abide by her contract. This is one of the many cases to be found where the purpose of the contract was for each to waive all their interests in the property of the other.

In *Tiernan v. Tiernan* (1922) 107 Neb. 563, an action was brought to construe the provisions of an antenuptial contract before the death of either. The prospective husband was 78 years of age, and was quite wealthy, while she was in moderate circumstances and supporting herself by menial work. They also, as in the case of *Rieger v. Schaible, supra,* entered into an antenuptial agreement, in which each waived any interest or claim in the other's property. They were married in 1915. The agreement provided that certain city property in Lincoln should be hers so long as she lived and remained his widow. It was held that her object was to secure maintenance during her entire life. It was held that the agreement was legal in every way, and was one of great benefit to the appellant, for it provided maintenance for her as long as she lived, and the antenuptial agreement was sustained.

In *Erb v. McMaster*, 88 Neb. 817, the prospective husband entered into an antenuptial contract to release all claims to the estate of his intended wife on the payment to him of $1,000 after her death. She paid him $330 in her lifetime and provided for the payment of the remainder of the $1,000 in her will. This was also in an action in partition, and he prayed for a decree giving him a one-fourth interest in the real estate of which she died seized and also that a homestead might be set apart to him. It was held that he could not accept and retain the benefits of the contract and at the same time maintain an action based upon its invalidity. "It was not until after his wife's death that he doubted the validity of the contract, which he wrote with his own hand. The court is of the opinion that good faith and common honesty require that he should still abide by the contract, now that she is dead. In good conscience he is estopped to do otherwise." It is further held that a tender by him of the money he had received, made at the time of argument in the supreme court, was too late to be effectual.

The case of *Neneman v. Rickley*, 110 Neb. 446, decided in 1923, involves a very short and well-drawn antenuptial agreement, witnessed by J. J. Sullivan. It was insisted that the antenuptial contract, which gave each a one-half interest in the property of the other, and also the right of survivorship, was unconscionable and a fraud upon the wife, who died four years after the contract was written. The court found that the consideration was the mutual transfer of property and the contemplated marriage. The charge of fraud was based upon the ground that their respective properties were of disproportionate value, but there was no evidence that the wife ever complained of the transaction. The contract was found to be good.

The case of *Stahl v. Stahl* (1927) 115 Neb. 882, is governed entirely by the decision in *In re Estate of Enyart*, 100 Neb. 337. Christian Stahl had nine children by a prior marriage, and the prospective wife had four. His property was all accumulated prior to the death of his

first wife. The prospective wife lived in New York City, and ascertained that he was a rich man, that he owned 560 acres of land in Fillmore county, with three sets of improvements on it, had a large home and live stock and farm implements, but she was not informed as to the actual value of his property. He sent her $125 to meet him in Omaha. He had an antenuptial contract provided before the arrival of his wife. They proceeded to the courthouse, where a license was secured and the antenuptial contract was presented to the wife, and while she signed and acknowledged the same, there is much doubt whether she could read English, or whether she was advised of the nature of the instrument which she signed, and whether it was executed knowingly by her. It is clear that she was wholly uninformed as to the value of his real estate and wholly unacquainted with farm values. She was a stranger in a strange land, without friends, and signed the agreement May 1, 1902, without being accorded an opportunity for consultation with any one who could advise her. It was therefore held that there was not a fair disclosure, nor did the wife have such knowledge of the nature and value of the property as to render the contract binding upon her. The provision for his widow was $2,000, and no more, and his property being worth $20,-000, it was held to be grossly disproportionate to his wealth, in accordance with *In re Estate of Enyart,* 100 Neb. 337.

In the case of *In re Estate of Waller* (1928) 116 Neb. 352, the antenuptial contract provided that if his wife survived him she should be paid $1,000 in full of all her rights and interest in his estate. A year and a half after their marriage she obtained a decree of divorce on the ground of extreme cruelty, and received as alimony $1,000 and all costs. Six weeks later James Waller died, and she claimed a widow's share in his estate, which was of the approximate value of $22,000.

The court found that the antenuptial agreement of two full pages was, of course, written in English; that the

prospective wife, a recent arrival from Germany, could neither read, write, nor understand the English language, and did not know what her marriage rights were. It was disclosed by an examination of the instrument itself in court that it was clearly intended by Waller for a prior anticipated marriage, as the former intended wife's name appears eight or ten times as the prospective wife, but that the name Mrs. Frida Durkran was inserted above the partially erased name of the former intended; the court remarking that it appears that Waller was no novice in his search for a helpmate. The court found that Waller wickedly availed himself of the ignorance of his intended wife, and of her lack of understanding of the English language, and her lack of information with respect to an antenuptial agreement, and perpetrated a grossly outrageous fraud upon her, and that good faith is the cardinal governing principle in an antenuptial contract.

An examination of these ten leading Nebraska cases discloses that, aside from the first case discussed, viz., *In re Estate of Enyart,* we find in two of them, to wit, *In re Estate of Maag* and *In re Estate of Waller,* that the antenuptial contract was set aside for fraud. The contract was set aside in *Stahl v. Stahl* because the prospective husband failed to make a fair disclosure of his property. In the cases of *Rieger v. Schaible,* where all rights were waived, *Erb v. McMaster,* where only $1,000 was to be paid after death, and *Tiernan v. Tiernan,* where only support after death of husband was provided, the contracts were held to be good; thus supporting the contention that, if one knows the exact amount and value of the property involved, there is no requirement that they know the value of the rights relinquished, as was well said by Carter, J., in his dissent, found *ante,* p. 140: "If she is acquainted with the facts she is presumed to know the law applicable thereto."

It may, therefore, be held to be established that ignorance on the part of the prospective wife of her legal rights in the property of the intended husband, or of her share

in his estate if she survives as his widow, will not, of itself, entitle her to avoid her antenuptial contract.

And, in these Nebraska cases just discussed, we find that the question whether the amount given the wife is small, or even nothing at all, does not affect the determination of the validity of the contract. Decisions from other jurisdictions are in accord therewith. *Birkbeck's Estate*, 215 Pa. St. 323; *Appleby v. Appleby*, 100 Minn. 408, 10 L. R. A. n. s. 590, 117 Am. St. Rep. 709; *Mallow v. Eastes*, 179 Ind. 267; *Kroell v. Kroell*, 219 Ill. 105; *Fisher v. Koontz*, 110 Ia. 498; *Dunlop v. Lamb*, 182 Ill. 319; *McNutt v. McNutt*, 116 Ind. 545; *Robbins v. Robbins*, 225 Ill. 333; *Ditson v. Ditson*, 85 Ia. 276; *Yarde v. Yarde*, 187 Ill. 636; *Hafer v. Hafer*, 33 Kan. 449; *Richard v. Detroit Trust Co.*, 269 Mich. 411; *Comstock v. Comstock*, 146 Ark. 266; 13 R. C. L. 1035, sec. 55.

Our analysis also tends to confirm our doubts as to the validity of our holding in the case of *In re Estate of Enyart, supra;* and we find that our court has already adopted an opinion in which we have departed from that decision, for in *Wulf v. Wulf, ante,* p. 158, which was released May 24, 1935, it was held: "Where each party to an antenuptial contract knows, or is properly chargeable with knowledge of, the extent and value of the other's property, a disproportion between the contractual provision for the wife and the amount allowed by the statute of descent does not shift to the husband the burden of proving a full disclosure in an action where the wife demands the cancelation of the contract on the ground of fraudulent concealment on his part." An antenuptial contract was signed by the parties December 24, 1927. It provided that if she was left his widow she should have the town property, valued at $5,000, and that no part of the property belonging to either of the parties should descend to the other. The district court held the antenuptial contract void, and gave her one-fourth of his property. Henry Wulf died September 21, 1932, without a will. He was 62 years of age and she was 50. He had

four children by his former wife, and she had three by her first husband. She was an aunt of his first wife, and had lived in the community for years, and she owned a farm near his farm. He called at her home three times, and during the first call proposed marriage. She talked the matter over with the attorney at the time the contract was drawn, and it was stated that both of them were waiving a one-fourth interest in the other's estate, and they said they knew each other's property. The contract was read to both parties. She examined the antenuptial contract a year and a half after her third marriage. The value of Wulf's real estate was about $45,000. It was held that, under the facts outlined, the antenuptial contract was not void on the ground that he had not fully disclosed in advance the nature and extent of his property, or on the ground of an unfair disproportion between the contractual provision and the amount allowed by the statute of descent.

In a Pennsylvania case, Dr. McCready, a widower of 74 years, worth perhaps $50,000, married a widow of 63, who was possessed of great wealth. Her attorney presented an antenuptial contract to be signed and started to tell of her large holdings, and was interrupted with, "Probably I know more about her property than you do," and a contract was signed in which each waived all rights in the property of the other. She died in less than ten years, having not only paid all expenses, which included expensive trips here and abroad, but had given him large sums of money for his personal expenses, and left him $1,000 a month in her will. When he discovered that he could not be deprived of this bequest by contesting the antenuptial contract, he brought this action. Dr. McCready knew exactly what he was doing when he signed the contract. He knew she was a woman of large means, though he did not know of exactly what her property consisted. There was no attempt to misrepresent anything. His attempt to break the contract he had signed just before their marriage was entirely unsuccessful in the courts. *McCready's*

*Estate,* 316 Pa. St. 246. To similar effect is the opinion in *Leonard v. Prentice,* 171 Okla. 522, which was prepared by a committee of three attorneys of the judicial council of Oklahoma, and adopted by its supreme court.

Has not too great stress been given in some of our Nebraska decisions to the division of the property between the spouses? May not a prospective wife, who greatly desires a home and protection, marry a man of independent means, with many grown children by his other marriages, with little regard for the amount of property given her by the marriage settlement she signs? In any event, if she is dissatisfied she ought to refuse to sign the contract, or, if signed, not continue to accept its benefits for more than 17 years during her husband's life without complaint, and then seek to repudiate it after his death. See *Neely's Appeal,* 124 Pa. St. 406, 10 Am. St. Rep. 594.

When each party to an antenuptial contract, legally executed under section 30-106, Comp. St. 1929, is chargeable with knowledge of the extent and value of the other's property, a disproportionate allowance for the prospective wife does not shift the burden of proof to the husband or his representatives to sustain the contract, and to that extent our holding in the case of *In re Estate of Enyart,* 100 Neb. 337, is hereby overruled.

It is the opinion of the majority of the court that the antenuptial contract set out in our former opinion, *ante,* p. 130, is valid, legal, and binding upon the parties, and should be enforced, and such former opinion is hereby vacated. The judgment of the district court is reversed, and proceedings in accordance herewith directed.

REVERSED.