In the Matter of the **ESTATE** of Burley F. BORTON, Deceased.

Sadie L. **SCHULTZ**, Appellant (Petitioner-Plaintiff below),

v.

George F. **BORTON**, Administrator of the Estate of Burley F. Borton, Deceased, Appellee (Petitioner-Defendant below).

No. 3217.

Supreme Court of Wyoming.

July 9, 1964.

R. L. Gilbert, Morrill, Neb., and Donald E. Jones, Torrington, for appellant.

Hathaway & Sigler and Stanley Hathaway, Torrington, and Holtorf, Hansen & Fitzke, Gering, Neb., for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY and McINTYRE, JJ.

Mr. Justice GRAY delivered the opinion of the court.

Burley F. Borton died intestate on the thirteenth day of January, 1963. He left surviving him a widow, now Sadie L. Schultz, appellant herein, three adult sons, and one adult daughter. Shortly after the death of decedent the son George commenced probate of the estate of decedent and petitioned the court for appointment as administrator. The other sons and the daughter joined in the petition, and for the reason that our statute, § 2–93, W.S.1957, gives preference of appointment to the surviving spouse there was annexed to said petition an antenuptial agreement executed on December 4, 1962, by decedent and appellant wherein appellant was alleged to have relinquished her rights under the statute. On January 25, 1963, the petition was granted and on that same day George duly qualified as administrator and entered upon his duties. However, on March 4; 1963, appellant petitioned the court for an order appointing her nominee as administrator of the estate of decedent. Attached to said petition was a pleading alleging that as the surviving spouse of decedent appellant had a preference with power of appointment under the statute, and the relief sought was that the order appointing the son George as administrator be vacated; that his letters testamentary be revoked; and that the matter be set for hearing. No mention was made of the antenuptial

agreement. Following this, a pretrial conference was held and it was ordered that issues concerning the validity of the antenuptial agreement, the preference right of appellant in the administration of the estate, and the rights of inheritance to the estate should be made up by pleadings of the parties.

Appellant's pleading in substance alleged that on December 4, 1962, the date of the agreement, she and decedent were engaged to be married and were married on December 6, 1962; that appellant was the surviving spouse and legal heir of decedent along with his children; that on December 4, 1962, decedent owned property valued at $104,465.00 free from indebtedness, but she was without knowledge thereof and had not been informed of the extent or value of such property; that appellant was not informed of her rights as his wife or as a widow; that the meaning of the agreement was not explained to her; that the sum of $10,000.00 received by her on the day the agreement was signed was inequitable, unjust and unreasonably disproportionate to the means of decedent and her rights in his property upon his death; that in addition to the $10,000.00 decedent represented that he would provide for her from his income and property for the remainder of her lifetime; that she was induced to sign the agreement by his statement that he would place his savings account in a joint bank account for her use and protection and she did not learn that this was not done until after the marriage; that as further inducement the decedent represented that the agreement covered only lands that would go to their respective children and she did not understand nor was she advised that it covered all property; and that because of those matters the agreement was void. It was also alleged that the agreement was void as against public policy because it modified and limited the duty of decedent to support his intended wife.

The answer of the remaining heirs of decedent admits the execution of the agreement, payment of the $10,000.00 to appellant, the date of marriage, and that appellant was the surviving spouse. All other allegations above summarized were denied, and it was then affirmatively alleged that appellant had been advised of the effect, consequences, and purposes of the agreement prior to signing; that the nature and value of decedent's property was discussed but was limited after appellant stated she did not want decedent's property but wanted it to go to deceased's children; that the agreement was read and explained to appellant before it was signed; that appellant said she understood it and wanted to sign it; that the consideration received by appellant was fair and equitable; and that appellant was estopped from denying the validity thereof.

Subsequently, on June 18, 1963, appellant filed application for a widow's allowance for support in the sum of $200.00 per month from the date of death to settlement of the estate, and in this she represented that such sum was reasonable for her support in keeping with her circumstances and accustomed mode of life. In this connection it should be stated that she remarried in April 1963, and there is evidence that she was then being supported by her third husband.

Thereafter the matter came on for trial and on June 19, 1963, the trial court entered an order denying the petition of appellant for appointment of her nominee as administrator; denying the application for widow's allowance; overruling the objections of appellant to the antenuptial agreement and holding the agreement to be valid and binding in all respects; and declaring that appellant had no rights of inheritance from decedent's estate. It is from that order that this appeal is taken by appellant.

One of the complaints made on this appeal by appellant was the refusal of the trial court, on two or three occasions, to permit appellant to testify, over objection, to conversations had with decedent because of the so-called Dead Man Statute. We find no occasion seriously to consider such

contention for the reason that substantially all of the matters stated in appellant's offers of proof in some fashion or other, aside from the offers, got into the record. Presumably these matters were considered by the trial court in reaching its conclusions, and we have given attention to them here. If the ruling of the trial court was error, it was harmless.

██ The complaint made with respect to the agreement being contrary to public policy for the reason that its terms relieved decedent of his duty to support appellant also requires little discussion. We do not so read the agreement. True, the agreement is not artfully drawn to avoid such a contention, which is based upon literal language of the agreement, but on the other hand an intention by decedent to commit a criminal act in violation of a husband's statutory duty of support for his wife is not lightly to be inferred. Reasonably construed, the provisions of the agreement relate to the subject matter of the agreement, which was "the mutual desire of the parties that all property and property rights of each shall be, and be maintained for the benefit of her or him and her or his heirs, legal representatives and assigns, as though no marriage relation ever existed between them." The only direct authority cited by counsel to support the contention is the case of French v. McAnarney, 290 Mass. 544, 195 N.E. 714, 98 A.L.R. 530, but in that case it will be noted that the agreement contained a provision whereby the prospective bride specifically waived her right to support.

Before coming to grips with appellant's principal contentions regarding matters that are said to invalidate the agreement as a matter of law we should relate further some of the circumstances surrounding the transaction.

Paragraph 1 of the agreement recites a deposit of the sum of $10,000.00 by decedent to a savings account in the name of appellant and sets it aside as the sole property of appellant. Paragraph 2 then sets aside to each party all other "property of

whatsoever nature, kind and description now owned or hereafter acquired by her or him" with the right to deal separately with the property as though unmarried, and contains also the usual mutual disclaimer and release of "all and every right, claim and estate, which she or he might, would or could have, hold or acquire in, to or upon all or any of the said property of the other by reason of said marriage." A later provision excepts property that might be jointly purchased and held in their joint names subsequent to marriage. Provision is also made for the execution of instruments to carry the terms of the agreement into effect. Paragraph 4 reserves to each of the parties the income from his separate property and provides also that each will be responsible for his own debts contracted before marriage.

It has been stipulated that at the time this agreement was executed the decedent was 76 years of age, with a life expectancy of 5.88 years; that he had been previously married and was survived by four adult children; and that he was possessed of the following property:

| | |
|---|---|
| Real Estate in Nebraska—Value | $ 15,047.00 |
| Real Estate in Wyoming—Value | 28,000.00 |
| Miscellaneous Personal Property | 3,104.06 |
| Savings Account | 62,297.00 |
| Checking Account | 5,882.00 |
| Total | $114,330.00 |

In addition to the stipulation there was evidence that early in May 1962 the decedent suffered a severe illness and was in the hospital for some two months. It was on that occasion that the parties became acquainted. Decedent remained under a doctor's care until at least September 1962, and there was further evidence from which the trial court could find that he was an ill, feeble old man all during the so-called courtship and the marriage. On or about January 9, 1963, he suffered a cerebral hemorrhage and died on January 13, 1963.

Concerning the appellant, it was stipulated that she was 56 years of age with a life expectancy of 16.72 years on the date the agreement was signed; that she owned

some 17 acres of land near Morrill, Nebraska, valued at $6,000.00, subject to an indebtedness of $2,000.00 secured by a mortgage; and that she owned no other property except household goods. Aside from the stipulation there was undisputed evidence that she had been married previously to a Mr. Wheeler; that two children, a daughter and a son, resulted from that marriage, and both were living at the times herein; that the family made its home upon the above acreage, and at the time of Wheeler's death in 1956 the mortgage indebtedness on the land, some 14 acres of which were irrigable, was in the sum of $5,000.00; that Wheeler left her no other property, and appellant and her son continued to reside on the land after the daughter married and were residing there in December 1962; that appellant was forced to seek employment, and worked as a nurses' aid in the hospital at Scottsbluff, Nebraska, from which she earned approximately $1,800.00 per year; that the son—24 years of age in 1962—worked spasmodically and contributed approximately $600.00 to their mutual support, but the earnings of both did little more than meet the cost and expense of maintaining the home.

■ With that general background we come now to consider the contentions concerning the validity of the antenuptial agreement. We think counsel for appellant can hardly be serious in advancing to this court that there was evidence before the trial court that compelled a finding of actual fraud on the part of decedent. It is lodged on the basis of the testimony of appellant, her sister, and her son, and certain offers of proof, that decedent represented that the agreement was to embrace real property only and was necessary because decedent's children were objecting to the marriage; that he would make provision for her support for the rest of her life; that he would transfer his savings to a joint account for her protection; and that he would make her a "well to do woman." Without reference to any legal impediment as to competency, such evidence at best did no more than

establish an equivocal promissory representation relating to the future and was not sufficient to sustain appellant's burden of proving the fraud by clear, cogent and convincing evidence. Hiatt v. LaFever, 69 Wyo. 373, 242 P.2d 214, 216; Goodson v. Smith, 69 Wyo. 439, 243 P.2d 163, 171, rehearing denied 244 P.2d 805; Bushnell v. Elkins, 34 Wyo. 495, 245 P. 304, 307, 51 A.L.R. 13. Furthermore the testimony was so at odds with the circumstances surrounding the execution of the agreement, of which more will be said, that the trial court could scarcely have done otherwise than to reject it.

■ Absent actual fraud, was there then constructive fraud as further contended by appellant? Constructive fraud has been defined as consisting of all acts, omissions, and concealments involving breaches of a legal or equitable duty resulting in damage to another, and exists where such conduct, although not actually fraudulent, ought to be so treated when it has the same consequence and legal effects. In re Arbuckle's Estate, 98 Cal.App.2d 562, 220 P.2d 950, 954, 23 A.L.R.2d 372.

To aid its contention that constructive fraud is shown here as a matter of law, the appellant advances a rule to the effect that because of the engagement of the parties a confidential relationship resulted whereby decedent was duty bound to make a full disclosure to appellant of the extent, nature, and value of his property, and because the record fails affirmatively to show such a disclosure a breach of good faith rendering the agreement unenforceable was established. We would agree with appellant's premise that so far as we can determine appellant was not furnished with itemized detail of decedent's wealth, and under some of the authorities cited to us by appellant such fact would be regarded as sufficient to vitiate the agreement. See Annotation 27 A.L.R.2d 885.

However, there is by no means unanimity with respect to application of such a rule. Some of the states reject the rule as too broad and too rigid. Johnston v. Johnston,

Ind.App., 184 N.E.2d 651, 654; In re Parish's Estate, 236 Iowa 822, 20 N.W.2d 32, 36, 37; In re Phillips' Estate, 293 N.Y. 483, 58 N.E.2d 504, 507–508, motion denied 294 N.Y. 662, 60 N.E.2d 389; In re Knippel's Estate, 7 Wis.2d 335, 96 N.W.2d 514, 519; In re Koeffler's Estate, 215 Wis. 115, 254 N.W. 363, 368. In at least two jurisdictions it is said that the rule springs from the archaic presumption of inequality or dominance by the husband which should no longer be indulged. Del Vecchio v. Del Vecchio, Fla., 143 So.2d 17, 20; In re Moore's Will, Surr.Ct., 41 N.Y.S.2d 697, 701. In essence those states which decline to follow the rule hold that each case will be decided upon its own particular facts and unless there is evidence of overreaching, deceit or outright concealment by the prospective husband from which an inference of fraud might be drawn, the agreement will not be set aside.

■ In the case of In re Ward's Estate, 178 Kan. 366, 285 P.2d 1081, 1084, the Supreme Court of Kansas states the rule in a somewhat modified form, but its comment with respect to application of the rule is informative, is in keeping with the jurisdictions above mentioned, and we think states the more reasonable view. In that case it is said:

"Appellant sets forth the general rule that there must be a fair disclosure of the nature and amount of the assets to which the intended bride contracts to renounce her statutory rights, and a failure to deal openly and fairly will render the contract unenforceable. We have no quarrel with this rule. However, where it appears an antenuptial contract was understandingly made and freely executed, and where there is an absence of anything showing fraud or deceit, the mere fact the intended husband did not disclose in detail to the intended wife the nature, extent and value of his property will not, of itself, invalidate the contract or raise a presumption of fraudulent concealment, and if from a consideration of all the facts concerning the situation of the parties, such as their respective ages, family conditions, property rights, etc., at the time the contract was made and the trial court concludes the intended wife was not overreached, the contract should be sustained. * * *"

■ With the foregoing general principles in mind we again turn to the evidence to determine whether or not the trial court was warranted in concluding that appellant understandingly and voluntarily entered into the agreement. We are satisfied that it was. In the first instance, whatever is required of the parties with respect to good faith and candor, it could scarcely be argued that the duties are not reciprocal. Assuming, as held by some authorities, that appellant was under no duty to speak or inquire concerning detail of decedent's wealth, it would also follow that she would not be permitted to mislead anyone as to her need for such information. By her own admission, although she now attempts to qualify it, she advised the attorney selected to draft the agreement that she did not want any of decedent's property, but wanted his children to have it. According to the testimony of the attorney her only concern was immediate payment of the $10,000.00 and the drafting of a deed conveying her own property to her son, with reservation of a life estate. Then after the instrument had been prepared and before it was signed, again as shown in part by her own admission and by further testimony of the attorney, she was asked if she understood the agreement and she answered "yes." She was then asked if there was anything further she wanted explained or added to the agreement and she said "no." If, as appellant now contends, she was without adequate information intelligently to appraise that which she was relinquishing, it was incumbent upon her when asked so to state. "Even when a party is under no duty to speak regarding a matter, if he does speak, he must speak the truth and make a full and fair disclosure." Twing v. Schott, 80 Wyo. 100, 338 P.2d 839, 843.

It is clear also that appellant had a great deal of general knowledge of decedent's wealth. There is evidence apparently accepted by the trial court that decedent was prone to boast about his wealth—in fact to exaggerate—and that he did so to appellant and her family is quite evident. Appellant testified that decedent had said he had a good sum of money saved; that she knew he had a "goodly amount in the bank"; and that "He always said he was well to do. He never referred to it in numbers." Appellant's sister also testified that decedent said "he had plenty in the banks and savings" and appellant knew this; that he said he had quite a "lot of land" and was getting income from it and also from interest and social security; that she considered him well to do because he said he was and he made no secret of it; and that decedent made no attempt to hide his wealth from appellant. With respect to the land, her information was more than general. She knew decedent had land in Nebraska of a value of at least $400.00 per acre. As to the Wyoming land, appellant testified that decedent had taken her upon the land and pointed out its extent. Having been raised on a farm, appellant must be charged with having some knowledge of the value of farm lands. The foregoing was ample if accepted by the trial court to support an inference that she had sufficient knowledge upon which to act.

Likewise we find no merit in appellant's contention that she was overreached because of her lack of education and experience in such matters. While her testimony was in some conflict with that of the attorney concerning what occurred at the conference leading up to the agreement, that conflict has been resolved by the trial court against the appellant, and the trial court's findings are accepted here. With respect to the $10,000.00 provision that was made for appellant the attorney testified that he was first asked to make a bequest of such amount to appellant in a will that was to be prepared for appellant and for which arrangements had also been made on the same day. Upon being so advised the attorney called in his secretary and started dictating the agreement in the presence of the parties. When the attorney reached the provision concerning the $10,000.00 the appellant inquired if it would not be possible for the children of decedent to question the bequest on the grounds of the competency of decedent and when advised that this was possible, arrangement was made for immediate transfer of such amount to a savings account in her name and to which decedent relinquished all claim. In addition appellant insisted upon the preparation and execution of a deed to her son of her own real property with reservation to her of a life estate, thus freeing it from any terms of the agreement. Appellant's insistence that these special provisions be made for her protection is hardly consistent with her professed naivete.

In addition to the foregoing matters, the record shows a close relationship between appellant and her son and considerable knowledge on the part of the son concerning the progress of his mother's efforts to assure her financial future and make her a "wealthy woman." It will be recalled that this agreement was executed on December 4, 1962, two days prior to the marriage, and the attorney testified that a copy was delivered to her at that time. Although appellant did not testify that she had discussed the agreement with her son prior to the marriage, the trial court might well have drawn such inference from the son's testimony. He testified:

"Q. Handing you what has been marked as defendant's Exhibit 2 [the agreement] have you seen that Exhibit, that instrument prior to today? A. Yes, sir.

"Q. When did you first see it? A. December 4th, in the evening.

"Q. Did you talk with Mr. Borton [decedent] concerning that instrument? A. Yes, I did, I asked him—

"Q. When did this take place? A. Right after the marriage. About the

8th or 10th, between those two dates. * * *"

This was in the nature of independent advice and it was not her only opportunity in this regard. She testified:

"Q. You received a copy of this agreement? A. Yes.

"Q. You took it home with you? A. Yes.

"Q. Did you sometime thereafter take it out and read it over? A. Yes, my brother read it one day * * *."

These circumstances would have furnished additional reasons for the court's holding.

We now come to the further facet of the rule relating to confidential relation insisted upon by appellant to the effect that if the provision made for the prospective bride is unreasonably disproportionate to that which she would receive out of her husband's estate but for the agreement, it will be presumed that the prospective bride was not sufficiently informed as to the extent, nature, and value of the husband's property and the burden is upon the proponents of the agreement to prove otherwise. Again there is authority to sustain that view. Annotation 27 A.L.R.2d 891. There are also authorities to the contrary, and we might make mention of a retreat by the Supreme Court of Nebraska from adherence to the rule. In the cases of In re Maag's Estate, 119 Neb. 237, 228 N.W. 537; Stahl v. Stahl, 115 Neb. 882, 215 N.W. 131; and In re Enyart's Estate, 100 Neb. 337, 160 N.W. 120, upon which appellant relies, we find the rule as stated above. However, in the case of Kingsley v. Noble, 129 Neb. 808, 263 N.W. 222, the Nebraska Court, on the specific point of burden of proof, overruled the foregoing cases to the degree that if knowledge of the extent and value of the other's property is satisfactorily established, a disproportionate allowance does not shift the burden of proof.

Be that as it may, for reasons to be stated and for purposes of this case we think it unnecessary to resort to further analysis of the divergent views indicated by the authorities except to comment that in any event we have reservations concerning the adoption of such a rule in Wyoming. An antenuptial agreement is not contrary to the public policy of this state, Metz v. Blackburn, 9 Wyo. 481, 65 P. 857; a valid agreement making provision contrary to our laws of descent and distribution is specifically authorized under § 2-37, W.S.1957; the very purpose of the statutory provision contemplates a result contrary to the statute disproportionate as it might be; this court has long favored agreements between husband and wife entered into voluntarily as family settlement of their affairs, Rinehart v. Rinehart, 52 Wyo. 363, 75 P.2d 390; Beard v. Beard, Wyo., 368 P.2d 953; allegations that an agreement is inequitable, unjust, and unreasonably disproportionate is affirmative matter and under our procedure the burden of proof never shifts, although in the course of a trial the opposite party may be required to go forward with evidence to rebut a prima facie case, First National Bank of Morrill v. Ford, 30 Wyo. 110, 216 P. 691, 31 A.L.R. 1441.

However, assuming that there was some burden upon the appellees with respect to the equity and fairness of the agreement, we are of the opinion as concluded above that appellees produced ample evidence from which the trial court could charge appellant with knowledge, and since it appears that such agreement was understandingly and voluntarily entered into by appellant we think any burden thrust upon the appellees was fully satisfied.

Judgment affirmed.